11 Judge MIRIAM G. WALTZER.
STATEMENT OF THE CASE
On 31 January 2001, Catherine Louise Seddon filed suit in First City Court against Glenn John Simpson. Seddon alleged that during the course of a four-year extra-marital affair she gave birth to Simpson’s daughter. Several months after the child’s birth, Seddon and Simpson separated. Seddon alleged that during the course of their cohabitation Simpson committed theft of her identity, incurring debts of $6,000 in her name. Seddon al *917 leged in the alternative that Simpson borrowed $500.11 by using her Circuit City credit card without her knowledge or permission; that he borrowed over $1,000 by using her First Bankcard Center credit card at CompUSA without her knowledge or permission; that he borrowed $6,006.73 by using her First NBC/Bank One check card without her knowledge or permission; and that Simpson failed to honor his commitment to pay the entire $8,000 debt on a promissory note in favor of Dryades Savings Bank which Seddon co-signed, resulting in an unpaid amount of $2,895.75 plus interest and attorneys’ fees. Seddon alleged that Simpson’s various checks drawn in her favor in the 1 ¡.amounts of $400, $40, $286.50 and $600, intended to repay part of his debt to Seddon, were dishonored for insufficient funds. Seddon claimed that she made written demand for payment of the dishonored checks pursuant to the provisions of LSA-R.S. 9:2782.
Simpson filed a general denial, admitting only his status, paternity of Seddon’s child, jurisdiction and venue, demand for the allegedly dishonored checks, and that Dryades Savings Bank filed suit against both Simpson and Seddon for the unpaid amount of $2,895.75 plus interest and attorneys’ fees.
Seddon supplemented her petition by adding copies of her demand letters to Simpson and signed return receipts in connection therewith.
The matter was tried to the court on 20 September 2001 and on 8 October 2001 the trial court rendered judgment in favor of Simpson dismissing Seddon’s claims, with each party to bear its own costs. From that judgment Seddon appeals. We affirm the judgment of the trial court.
STATEMENT OF FACTS
The trial judge entered oral reasons for judgment at the conclusion of the testimony. She found that the parties were romantically involved for a number of years, during which they lived in a communal household, at times with other roommates and at other times with each other only. In this household, the items and responsibilities were shared. The judge rejected Seddon’s claim that the sums charged by Simpson on her accounts were loans to Simpson and found that it was Unot until the romantic relationship broke down that Seddon decided to go back through her records and look to find out which bills could be attributed solely to Simpson. The court rejected that division of expenses, finding as a fact that Simpson and Seddon were living together sharing expenses and that although Seddon kept the credit cards, purchases could not have been made without her authority. The court specifically rejected Seddon’s testimony that certain bills were solely for Simpson’s benefit and found, “the truth is that when the two of them were living together, they were both spending and incurring bills for the benefit of both of them. And despite what the testimony was, it was for the benefit of both of them. They intended to get married at some point, and they actually had a child together.” The judge found that Seddon had two options in dealing with the bills she now disputes. Seddon could have left and no longer allowed Simpson to incur bills. The other option was to make him leave the household. In response to Seddon’s counsel’s request to segregate the expenses attributable only to Simpson, the trial judge found that all the payments were incurred for the benefit of the household. She refused to separate the payments because that would be contrary to the agreement between 'the' parties.
The judge found that Seddon had been repaid for and consented to the charges represented by the NSF checks, some of which were child support payments that *918 Seddon acknowledged have been paid. The court noted that this is not the forum to deal with child support and certainly is not the forum to collect on payments repaid in the past.
I ¿THE TESTIMONY
Catherine Seddon, a resident alien citizen of Australia, testified that she came to the United States on a 1-A working visa for a contract nursing operation in 1993. In 1995 she received a resident alien’s pink green card. She subsequently obtained a Social Security number, opened a bank account and established credit. She testified that she met Simpson in a New Orleans bar in 1994, when she was working in Florida and Simpson was living in Baton Rouge, Louisiana. She visited and stayed with him and eventually came to New Orleans for a contract nursing assignment. In New Orleans, she moved in with Simpson and another man, and lived with Simpson for approximately three years. Their child was born in September 1998, and she left their apartment in January 1999. Seddon testified that she left because Simpson was financially irresponsible and she did not feel the apartment was a good environment in which to rear her child.
Seddon testified that in 1997 she had a check card that allowed her to access, her bank account and pay directly from that account at First NBC. She identified three charges on her June/July 1997 bank statement that she testified were not for her benefit: a transfer of funds that was not made to her account in the amount of $28.53; a charge to the University of New York in Albany in the amount of $10 and a charge to Specialty Books of Athens, Ohio in the amount of $61.94. Seddon testified that she “believed” these charges were for Simpson’s benefit, because she never at-, tended the University of New York and “never purchased books.” She |stestified that she confronted Simpson about the charges and he told her he would pay her back. Seddon admitted on cross-examination that she did not know if the $28.53 transfer was made to Simpson’s account.
, Seddon identified her July/August 1997 First NBC bank statement and testified that she had not authorized the following charges: Nine Technologies, Berkeley, California in the amount of $57.95; Star Sports, Phoenix, Arizona in the amount of $49; and the University of New York in the amount of $27. Although she admitted to having given Simpson a satellite dish, she denied that she had agreed to pay for ongoing digital service. Again, she testified that Simpson promised to reimburse her for these charges.
From the August/September 1997 First NBC statement, Seddon identified allegedly unauthorized charges of $975 for an account in Phoenix, Arizona, and $98.55 for an account in Athens, Ohio. She testified that the Phoenix charge was for Simpson’s tuition to the University of Phoenix, and the Athens charge was for books in connection with his studies. Seddon was in Vancouver, Canada when these charges were made. Seddon testified that a $79.80 charge appearing on that statement was for Simpson’s online Internet access account. Simpson had asked in advance to use Seddon’s account for this charge having agreed, according to Seddon, to reimburse her. Although Seddon denifed she benefited from MSN Online, she admitted on cross-examination that she did, at times, use the Internet, specifically using the MSN account.
|fiOn cross-examination, Seddon testified that she was paid twice a month and had no other sources of income. She also admitted that after her daughter’s birth in September 1998 she did not work for three months, and received only accrued vacation time paid out every two weeks during *919 that three-month period. Counsel confronted Seddon with non-salary deposits totaling approximately $3,300, which Sed-don characterized as mileage reimbursements from her employer. She admitted that she traveled only within the Greater New Orleans area. When asked whether Simpson made any of the deposits, she replied, “Not to my knowledge. Not to my recollection.” She admitted that “there may have been deposits related to living expenses” from Simpson and the other man with whom she lived, but she refused to credit any of these deposits to Simpson. Seddon also admitted that her account was credited for items Simpson returned, in the amounts of $24.47 and $10.20.
From the September/October 1997 First NBC statement, Seddon claimed a $19.95 charge for MSN Online Billing was made subject to Simpson’s reimbursement undertaking, and a $59.90 charge for Sports-line USA from Florida was simply unauthorized. She could not identify what the Sportsline charge represented. Seddon was unsure as to which of the charges had been subjects of confrontation between herself and Simpson.
From the October/November 1997 First NBC statement, Seddon disputed only an MSN Online charge in the amount of $19.95.
17From the November/December 1997 First NBC statement, Seddon disputed $11 and $10.75 charges for the University of New York and $88.92 for Direct TV Service. When asked if these charges benefited her, she replied, “I really don’t think so. I really don’t watch it, I work a lot. I really didn’t watch a lot of TV. I came to watch the soapies and that was about it. And no, I have never attended the University of New York in Albany.” On cross-examination, she admitted that she watched Direct TV movies on occasion and used to videotape soap operas. Simpson testified that these were British soap operas, such as The East Enders, that were available only through satellite television, and that he often taped them for Seddon. In addition to having admitted to watching TV, Seddon testified that she listened to music on the Direct TV music channels on occasion, although she denied that she benefited from the Direct TV expense. She also admitted watching the news on the Direct TV service.
From the December 1997/January 1998 First NBC statement, Seddon disputed an MSN Online charge for $19.95; a University of Phoenix charge of $1,035 and a Specialty Books of Ohio charge of $101.47. She said the charges were not made with her consent, and when she confronted Simpson about the charges, he agreed to reimburse her.
From the January/February 1998 First NBC statement, Seddon disputed an MSN Online charge for $19.95; University of Phoenix charges of $5 and $12.50; a McGraw Hill charge for $57.23 and University of New York charge for $34. She claimed none of the charges benefited her and were personal benefits to Mr. IsSimpson for which he had promised to repay her. Seddon testified, “There was always a good faith promise that he would pay.”
From the February/March 1998 statement, she disputed the MSN Online charge of $19.95.
From the March/April 1998 statement, Seddon contested an MSN Online charge for $19.95 and a Direct TV service charge for $43.34. The next month, she contested a Specialty Books charge of $371.17; MSN Online charge of $19.95; and a Fanstar Sports charge for $35.
From the May/June 1998 statement, she contested an MSN Online charge of $19.50, *920 and the next month an MSN Online charge of $22.32. She testified that she confronted Simpson about the online charges, and, when asked by her attorney what understanding she had, replied, “That he would reimburse me, that he would TRY TO MAKE AMENDS of the excess charges [emphasis added].” When asked if he had reimbursed the charge, she replied that she did not “believe so.” A copy of the first page of the June/July 1998 statement is part of Exhibit 1 and shows a starred entry representing an MSN Online billing of $228.32. However, Seddon testified that the MSN Online charge she questioned was $22.32.
From the July/August statement, Sed-don contested an MSN Online charge of $22.32, although the statement shows a charge of $232.42.
From the August/September statement, Seddon contested a $171.90 charge for Direct TV Services; a $1,035 University of Phoenix charge; an ATM withdrawal of $50, and a $6 charge for Tiffin Inn Pancake House. Seddon testified |3that she was in the hospital for the delivery of her daughter when the Pancake House charge was made. She admitted on cross-examination that she did not call Tiffin Inn Pancake House or Cybermedia to question the charges, but merely attributed them, without further investigation, to Simpson.
From the September/October 1998 statement, Seddon contested a $9.95 Cyber Media charge, a $19.95 MSN Online charge, and a $39.95 Sportsline USA charge.
The October/November 1998 statement, reflecting the takeover of First NBC by Bank One, contained one contested charge of $19.95 for MSN Online. Similarly, Sed-don contested the $19.95 MSN Online charge on her November/December 1998 statement.
From the December 1998/January 1999 statement, Seddon contested an MSN Online charge of $19.95.
On the January/February 1999 statement, Seddon contested an MSN Online charge of $19.95 and a payment of $70 toward a seriously delinquent bill from Circuit City. At this time, she had moved out of the shared apartment. She testified that she had originally received a Circuit City bill for $500.11 in October or November, and had not purchased or authorized the purchase of computer software. However, Simpson testified on cross-examination that the scanner he purchased from Circuit City was intended to send photos, for example, of the expected baby to Sed-don’s family in Australia. Seddon testified that when she received the Circuit City statement, she confronted Simpson and asked him to be | ^responsible for the payment. She also asked why he had accessed her account without her permission. She testified that she had obtained the card for his usage because he had a poor credit rating and was unable to obtain a card, but that he was responsible for making payments for his charges. In January 1999, she received a past due bill from Circuit City in the amount of $580.67, including late charges and finance charges. The $70 payment reflected on her bank statement for January/February 1999 was to be applied toward that balance.
Seddon testified that a $730.75 charge for men’s clothing on her Sears charge card was made with her prior knowledge and approval. She testified that Simpson had no available credit on his own Sears card, was starting a new job and needed clothing. She went shopping with Simpson and they purchased “significant clothes and things like that with the understanding that he would reimburse me for that.” Simpson produced a check for $1000 drawn on his bank account payable to *921 Sears to be applied to Seddon’s Sears account for purchases made before the onset of their relationship. According to Simpson, he and Seddon paid each other’s bills frequently.
Seddon identified a First NBC credit card bill dated 3 July 1997. A $925 charge from Phoenix, Arizona was circled, and-the words “I owe Cat this” were written together with an illegible signature. Seddon testified that this was Simpson’s handwriting. Simpson admitted having made the charge, and testified that he reimbursed Seddon in full, although he had no written verification of the Inreimbursement. According to Seddon, Simpson had used her First NBC credit card without her permission to pay this bill, and agreed to reimburse her.
According to Seddon, none of these charges were intended as gifts to Simpson, although she did admit to having given Simpson gifts during the period of their relationship.
An Equifax document dated 21 January 1999 reflects that Seddon identified herself to Equifax as a “fraud victim”. She contacted the agency and asked that her claim of unauthorized access to her accounts be recorded. Her Trans-Union credit report alerted her to the fact that there was a bad debt charge off from Comp USA, reflecting an account Simpson had used. She contacted Comp USA, and told them the charges were made without her authorization. The bill was charged off as a bad debt, adversely affecting her credit rating. Her Experian credit report shows the delinquency of the Circuit City account and the Comp USA charge-off.
Seddon testified to several NSF checks given to her by Simpson, which she claimed were given in payment of his portion of household expenses and not in payment for the charges made to her various credit cards for his personal expenses. Seddon identified checks in the amounts of $40, $286.50 and $600, and a demand letter referring to an NSF check in the amount of $400. She identified demand letters sent to Simpson in connection with checks in the amounts of $400 (the receipt showing Simpson’s signature), $286.50 (no receipt was in the record), and $600 (the receipt showing it was unclaimed originally, but subsequently was signed for by Simpson). Seddon denied having received any reimbursement for |1?any ' of the checks, although Simpson testified that all the checks had been repaid. She testified that the $600 check represented delinquent child support. On cross-examination, however, Seddon admitted that Simpson who, Seddon admitted, was current in his support obligation had in fact, paid both the checks for $286.50 and $600. She admitted that she did not deposit the $400 check, which was dated 10 August 1998, until 29 March 1999. Furthermore, that check did not bear the notation “NSF”. Simpson testified that when they broke up, he gave her $400 in cash in place of the $400 check. Months later, she tried to cash the check, but Simpson advised the Dryades Savings Bank that he had already paid her for the check. The check was never returned for insufficient funds and was not stamped insufficient funds. On cross-examination, Simpson testified that he ignored the various demand letters sent by Seddon’s counsel because he had already paid in full the obligations represented by the checks and he had no money to spend on attorneys to argue his position with Seddon’s attorney because of the expenses of his pending child custody litigation.
Seddon testified that she incurred $3,913.31 in attorney’s fees to collect the NSF checks. On cross-examination, she admitted that the value of the checks and bank fees was only $1,849 and that the *922 amount of attorney’s fees was unreasonable.
Seddon testified that she and Simpson took out a debt consolidation loan from Dryades Savings Bank for $8,000. She claimed that although she signed the note, it was to be Simpson’s loan and only he would be responsible for its Inpayment. Seddon testified that in time she received demand letters from Dryades, which eventually sued Seddon on the debt. By consent of all parties, the First City Court entered judgment in favor of Dryades against Simpson in the amount of $8,775, to be paid according to a schedule set forth in the judgment. Seddon is not mentioned in the judgment. Seddon admitted on cross-examination that Simpson has paid the Dryades debt in full although there was no written agreement that he would be solely responsible for its payment.
Seddon testified that since having left Simpson she was denied a Discover Card, was denied credit by Gateway Computers, was denied a Capitol One credit card, and was charged a higher than usual rate when she purchased her car. Gateway eventually extended her credit at 23.99 percent and Capitol One at 17 percent. On cross-examination, she admitted that prior to her problems with Simpson’s use of her credit, she was paying 21 percent on her Sears credit card and 26 percent on her Circuit City account.
On cross-examination, defense counsel confronted Seddon with several checks paid by Simpson to her: dated 1 October 1997 for $2500, dated 11 October 97 for $500, dated November 1997 for $150, dated February 1998 for $800, dated 24 April 1998 for $100, dated 6 May 1998 for $300 (bearing the notation “books”), dated 6 May 1998 for $150 (bearing notation “En-tergy, USS, BS and Water”); dated May 1998 for $50; dated 8 May 1998 for $69 (bearing notation “MSN”). Seddon initially claimed the $2500 bill was for utilities, but, when confronted with an October, 1997 check made out by Simpson to Enter-gy for $150, she admitted the | u$2500 was “perhaps not for Entergy.” Similarly, she was shown an October 1997 check drawn by Simpson payable to Bell South, whereupon she admitted the $2500 was not for that utility. She also admitted' that he occasionally paid for her cell phone. She was also shown checks to Schwegmann’s grocery in the amount of $246.13 dated 7 October 1997, to Bell South Mobility for $119.24 and to the Sewerage and Water Board for $100, also dated October 1997.
Seddon also identified Simpson’s November 1997 checks to Bell South for $123.61, to Entergy for $102.50, and to Time Magazine (for a subscription in Sed-don’s name) for $10.71. She also identified a December check to the Times-Picayune (for a subscription in Seddon’s name) for $24, and a January 1998 check to the Jewish Community Center, where Seddon worked out and was a member, for $69. She identified November 1998 checks in the amounts of $101.02 for the apartment where they lived, $252, $145.84 to Bell South, $86.58 to Telegroup (an international telephone exchange company) and $88.47 to the Sewerage and Water Board. She admitted that Simpson had no family abroad although she did, and that the Tel-egroup payment probably represented charges she made. She identified December 1998 checks for $91.45 to Entergy, $39.60 to the Sewerage and Water Board, for $550 to landlord A1 Johnson and $108.39 to Bell South.
On cross-examination, she admitted that on 6 May 1998 Simpson paid $4,635.53 on Seddon’s Comp USA account in payment for the computer that they both used. She also admitted Simpson’s payments to Comp USA for $16 and to Circuit City for $18.
*923 |1sSeddon was unable to substantiate her claim that Simpson stole her identity, since she was not able to provide evidence of any credit card issued to him based on his use of her identification. She also admitted that although she noticed Simpson’s charges on her accounts in June 1997, she did not cancel the accounts until January 1999, when she moved out of their apartment and continued to allow him to use them for nearly two years.
On cross-examination, Seddon testified that when she moved in with Simpson and the other man she brought linens, a television set, her clothing and cutlery. Simpson provided a bed, sofa and table. Subsequently; she purchased a sofa and loveseat, two beds and kitchen items. Together they purchased a washing machine and dryer. When she left the apartment, she took the sofa, beds, the washing machine and dryer, her personal effects, pots and pans.
Glenn J. Simpson testified that Seddon moved in with him and two other roommates in 1995, when he finished college. Six months later, he, Seddon and their roommate, Richard, moved to another house. In 1996, Richard married and Sed-don and Simpson moved again. He was finishing course work through an online program of the University of Phoenix and New York University, and was working on his Master’s Degree in Business Administration when the disputed credit card charges were made. Seddon was aware that he was taking the courses, and was eventually reimbursed the cost through a continuing education student loan program sponsored by Simpson’s employer, the Coca-Cola Company. Furthermore, Simpson testified that he and Seddon were contemplating marriage, |1fiand both agreed that in order to increase his income, he would need additional education that would benefit them both.
Simpson testified that while they were living together, he and Seddon commingled their finances. She generally wrote checks on his account, and he signed the checks. He also confirmed that his checks to the various utilities and grocery stores and to the landlord represented the entire bill from those entities. He testified that he never used Seddon’s cell phone or her Telegroup international phone service.
After Richard moved out, Simpson had a total hip replacement and for two or three months Seddon took care of him and picked up the slack on the bills. She also received payments from Coca-Cola for Simpson’s disability, which were made out to him and which he endorsed over to her. According to Simpson, Seddon controlled the purse and their relationship. He testified that he paid Seddon back for all the charges he made on her credit accounts. He made some payments in cash directly to her, and satisfied the obligations at other times by paying the full amount of various utility and other household expenses that would otherwise have been divided between them.
Simpson identified a check on his account to Belladonna dated 19 January in the amount of $160, for spa services rendered to Seddon. He testified that from September 1998 through January 1999 he paid all household bills, rental payments and Seddon’s Telegroup expenses. From 1997 through September 1998 Seddon l17paid only rent and utility bills for two months. Simpson testified that he paid the remainder of the bills for that period.
Simpson testified that Seddon’s claims are part of her plan to drain his resources so that he will not be able to continue the three-year long custody litigation pending in Orleans Parish.
STANDARD OF REVIEW
In reviewing the factual findings of a trial court, an appellate court is limited to *924 a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100, p. 4 (La.1/16/96), 666 So.2d 612, 614.
When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Only where documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, may the court of appeal find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a fact finder’s finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
LaFIRST ASSIGNMENT OF ERROR: The trial court erred in failing to separate payments made for shared household expenses from loans made by Ms. Seddon to Mr. Simpson.
Seddon relies on her testimony that Simpson promised to repay the money he “borrowed” to pay for various expenses characterized by Seddon as for his exclusive benefit.
The trial court rejected this testimony, finding that the expenses benefited the communal household, and that it was not until the romantic engagement ended that Seddon decided to seek reimbursement. We find that the testimony supports the trial court’s conclusion that the expenses benefited the couple and their household. As the court noted, the expectation of the parties was that they eventually would marry. Simpson’s educational expenses clearly would benefit the couple, as they would enable the household income to increase. In the event, Simpson testified that he had repaid Seddon for those educational expenses. There was ample testimony, as well, of benefit to Seddon from the rental payments, utility payments, satellite television, international phone service and computer/Internet expenses. The trial court’s conclusion that there was no legal basis for identifying any of the bills as being for Simpson’s exclusive benefit, and outside the approval Seddon expressed by allowing Simpson to use her credit accounts, is amply supported by the evidence and is not manifestly erroneous or clearly wrong.
The parties decided for their own reasons not to take advantage of the rights provided by law for persons entering into a valid marriage with respect to acquisition and ownership of property and allocation of debts and assets upon |19dissolution of marriage. Seddon had the burden of proving that somehow the payments she made on her accounts and otherwise were loans to Simpson. She failed to carry that burden. The evidence clearly supports the trial court’s conclusion that Seddon failed to prove that payments made on her accounts were intended by both parties to be loans to Simpson.
This assignment of error is without merit.
SECOND ASSIGNMENT OF ERROR: The trial court erred in admitting irrelevant evidence of shared household expenses.
The issue of whether evidence is relevant lies within the sound discretion of the trial court, and its ruling will not be disturbed on appeal absent clear abuse of discretion. Ibieta v. Star Casino, Inc., 98- *925 0314, p. 6 (La.App. 4 Cir. 10/7/98), 720 So.2d 143, 146.
The evidence of which Seddon complains was relevant to the court’s finding that the parties shared their household expenses during the time they lived together. Without the evidence of the bills that Simpson paid for the benefit of the household, a trier of fact could conclude that only Seddon contributed. This evidence contributed to creating a fuller picture of the economic relationship between the parties. There was no credible evidence that the amounts claimed by Seddon as loans were anything other than additional expenses of the joint household. We find no abuse of the trial court’s discretion in the admission of evidence of Simpson’s payment of household expenses.
This assignment of error is without merit.
I ;>nTHIRD AND FOURTH ASSIGNMENTS OF ERROR: The trial court erred in failing to address Non-Sufficient Funds charges and in refusing to admit Ms. Seddon’s testimony that child support arrearages had not been fully paid.
The Louisiana Civil Code Ancillaries provide in LSA-R.S. 9:2782 conditions under which damages and attorneys fees may be recovered on insufficient fund checks. The first requirement is that the check must have been dishonored for insufficient funds. Clearly, the $400 check introduced by Seddon was not so dishonored. As to the remaining checks, Seddon admitted having been repaid for the $600 and $286.50 checks, and the trial court determined that Simpson had, in fact, paid the $40 check as well. This conclusion is not manifestly erroneous or clearly wrong in light of credible supporting testimony by Simpson. Seddon failed to convince the trier of fact of the threshold requirement of the statute. Seddon argues that Simpson had not made all his past child support payments; however, there is un-controverted testimony from Simpson that he was current in his child support payments and had made all payments timely in accordance with orders of the trial court in those proceedings.
Seddon claims the trial court did not allow her to testify fully concerning the support arrearages; however, our review of the record in its entirety demonstrates that this issue was fully developed on direct examination and on cross-examination of both Simpson and Seddon. The trial court chose to believe Simpson’s testimony that he was current in his payments and was in compliance with the relevant court order.
These assignments of error are without merit.
| ?¶ADDITIONAL ISSUES RAISED BUT NOT ASSIGNED AS ERROR
Seddon alleges in brief that she relied to her detriment on Simpson’s promises to repay her loans and has established a claim for damages in Quantum Meruit. This claim is without merit, since the trial court found that both Simpson and Seddon were “enriched” by the charges made to Seddon’s credit accounts. Furthermore, Seddon failed to prove lack of justification or cause for the enrichment. The justification or cause was the immediate and prospective benefit to the household found by the trial court and supported by credible evidence.
Seddon also claims interest on the “loans” from the date each was made. Since Seddon failed to prove to the satisfaction of the trier of fact that any of the payments could be characterized as “loans”, and since we find the trial court’s conclusion in this respect not to be manifestly erroneous or clearly wrong, this claim is without merit.
*926 CONCLUSION AND DECREE
For the foregoing reasons, we affirm the judgment of the First City Court, Parish of Orleans, and assess the costs of this appeal against the appellant, Catherine Louise Seddon.
AFFIRMED.