MAX N. TOBIAS, JR., Judge.
|,Marjorie Slimp (“Slimp”), the defendant/appellant, has filed these consolidated appeals from the judgments rendered by the trial court below. Michael Sartisky (“Sartisky”), the plaintiff/appellee/cross-ap-pellant, has answered, seeking a modification of the judgment addressing the partition and reimbursements. After reviewing the record and applicable law, we affirm in part, reverse in part, and render judgment.
Slimp and Sartisky were in a romantic relationship for many years, each owning their own home. In 2001, the parties decided to sell their respective homes and purchase a house together. In September 2001, they purchased, as owners in indivi-sión, property located at 1328 Harmony Street, New Orleans, Louisiana. The purchase price of the house was $860,000.00; Sartisky’s initial contribution was $875,243.00 and Slimp’s was $197,372.90. The parties neither married nor agreed in writing to a proportional interest in the property other than the 50%-50% ownership presumed by law. From 2001 to 2008, the parties and Sartisky’s son, |2born of Sartisky’s former marriage, lived in the Harmony home as a family unit until the relationship ended in the latter part of 2007.[1]
Once the relationship ended, Sartisky indicated his desire to acquire Slimp’s interest in the house, but refused to pay what Slimp thought was a fair price. Instead, he filed partition proceedings against her in the district court, requesting that the house be sold. In addition to a partition of the property, Sartisky sought reimbursement of all amounts he expended on the property and injunctive relief to have Slimp removed from the house. This latter request was denied by the court.
After a request for a temporary restraining order and injunctive relief was granted for a period of ten days, the parties settled some of the issues between them by executing a written contract dated 16 April 2008. The contract provided, inter alia, that the property would be listed for sale for ninety days with an agreement that the property be sold in the event of an offer equal to or greater than $1,250,000.00, provided that the offer was a non-contingent cash offer. While some offers were received, none was a non-contingent cash offer; consequently, Sartisky refused to sell the house.
The contract also provided, and Slimp agreed, that she would vacate the premises in exchange for some concessions from Sartisky. In particular, Sartisky agreed to waive reimbursement of certain expenses from 1 June 2008 forward, the date Slimp agreed to vacate the property. In return, Slimp waived reimbursement |aof any credits from Sartisky for his and/or his son’s use and enjoyment of the house after 1 June 2008. The parties agreed that the contract would have no effect upon the pending litigation.
During the course of the proceedings, Slimp filed a motion in limine addressing Sartisky’s claim for reimbursement of ex *906 penses for several items. The trial court judge issued a judgment on 16 December 2008, holding that Sartisky could seek reimbursement for the alarm system’s monitoring, landscaping, and pool chemical expenses, but could not seek reimbursement for electricity, sewerage and water, telephone, and housekeeper expenses. The judgment reflected that Sartisky had agreed that he would not seek reimbursement for cable television and bottled water, so that part of the motion was moot.
At some time between May 2009 and April 2010, the case was reallotted to a different division of the district court and thus, to a different judge.
A scheduling order conference was held on 28 June 2010. At that time, the parties agreed that the pretrial conference would be held on 7 December 2010, with the trial set for 28 February 2011. On the date of the scheduling conference, the trial court judge signed and entered into the record a scheduling order which stated that “[a]ll supplemental pleadings and incidental demands must be filed and served on or before: NONE.”[2]
On the other hand, the pretrial notice and pretrial order, also signed by the trial court judge and entered into the record at the same time, stated:
|JT IS FURTHER ORDERED that any and all matters which could cause delay of the trial should be called to the court’s attention immediately. Continuances will not be granted if this Trial Order is not complied with strictly.
The pretrial conference was held as scheduled. Ten days later, 17 December 2011, Slimp filed a motion to file a first supplemental answer and reconventional demand against Sartisky. The reconven-tional demand asserted that Sartisky breached the 16 April 2008 contract, regarding the sale of the house, by refusing a private offer to purchase the house in an amount exceeding the agreed-to minimum sale price of $1,250,000.00. Slimp sought damages for, inter alia, the amount of money that she would have received if the property had sold for the greater amount than would be obtained in the sheriffs sale. The motion to file the pleading was presented to the duty judge who granted it.
Sartisky filed a motion for reconsideration and to rescind the ex parte order permitting the reconventional demand. At the hearing thereon, Slimp’s attorney stated that she believed that no deadline existed in which to file the reconventional demand as the scheduling order stated “NONE,” while all the other deadlines set actual dates. Sartisky’s attorney and the court stated that “NONE,” meant that no supplemental pleadings and incidental demands were going to be filed. In any event, the trial court found that Slimp was not in good faith and struck the incidental demand. Slimp indicated at the hearing that a separate suit would be filed.
|fiOn 8 February 2011, Slimp filed a petition against Sartisky claiming damages for breach of the April 2008 agreement and for abuse of rights.[3] Sartisky *907 filed exceptions of no cause of action and res judicata; the trial court found that res judicata attached and dismissed the petition with prejudice on 9 August 2011.
The trial in the original matter took place on 28 February 2011. Only the parties and their respective accountants testified.
Sartisky testified that he met Slimp during their respective work and, by 1996, she was living with him and his son, Joshua, in his home on Marigny Street in New Orleans.[4] Slimp owned a home in the Old Metairie neighborhood of Jefferson Parish which she visited periodically. When asked if either party wanted to marry, Sartisky stated:
Q. All right, sir. Did either of you want to get married?
A. No. As a matter of fact explicitly not on both sides. We both had been both married and divorced, had unhappy elements in our respective relationships and were determined not to be married.
In early 2001, Sartisky and Slimp discussed buying a house together. Sartisky wanted to live in uptown New Orleans due to the uptown location of his son’s school and the increase in Joshua’s social activities; that was the principal reason Sarti-sky wanted to and did moved from the Marigny Street house. They looked at approximately 300 properties, but not a single house met their criteria. |fAt that point, they stopped looking and Sartisky spoke to an architect who drew up plans to renovate the Marigny Street house.
Sometime thereafter, Slimp heard about a house on Harmony Street in the Garden District of New Orleans and convinced Sartisky to look at the house. Sartisky resisted, partly because the house was still too far from his son’s school to meet his original purpose. However, when he and Slimp toured the house, he liked it very much. The parties discussed selling their current homes and putting the proceeds toward purchasing the new house. Slimp thought that they would get similar amounts for the sale of their homes.
Sartisky testified that the ownership understanding was that their interest would be proportionate to what they were able to contribute to the down payment and monthly expenses; in this case, Sartisky contributed 75% and Slimp contributed 25%. Slimp was paying approximately $1,500.00 a month between the mortgage and normal operating costs for her home. It was the implicit understanding that she would be making a parallel monetary contribution towards living in the new house.
The parties made an offer to buy the house. In the process of negotiating a price and securing financing, Sartisky made a total of $50,000.00 in deposits.[5] The agreed-upon purchase price was $860,000.00; Slimp never indicated that she was unhappy with the price. Neither of their houses sold as quickly as they had hoped; however, Sartisky sold his near the last day for closing on the Harmony Street house. The proceeds from the sale of his house, $250,000.00, were rolled over to the savings and loan against the note. Slimp’s house sold about six or seven |7months later; the net proceeds from that sale were $197,000.00 and some change. Dur *908 ing the. time Slimp’s house did not sell, Sartisky paid the mortgage on the Harmony Street house.
At the time her proceeds were being applied against the Harmony Street house debt, Slimp became concerned that she would have no money of her own. Thus, Sartisky gave her a total of $15,000.00 in three separate checks, thereby lowering her contribution to the house to $182,000.00. Sartisky identified two checks for $5,000.00 each, both dated in late March 2002. Sartisky was unable to provide proof that he gave Slimp an additional $5,000.00.
Sartisky testified that Slimp paid almost nothing for six years towards expenses related to the house. He reiterated that from the beginning, the parties agreed that each would own a percentage of the house that corresponded to what each was contributing toward the mortgage, interest, and escrow, as well as the various expenses incurred for renovations, repairs, and utilities. However, as time went on, it became clear that Slimp could not pay her proportionate share and Sartisky’s percentage of ownership was increasing. He testified:
But it became clear that even with my covering those items [food and vacations] that her percentage was going to fall below even the 75/25 that we thought would end up being a target, and she was anxious about that. And at that point, I said, “I don’t want you to live with me being anxious about it. And even though our agreement was proportional, I will freeze the percentage. I will verbally commit to you, that your percentage of ownership won’t slip below 25 percent. As long as you keep paying the $1,000 a month and don’t renege on that, then your percentage won’t slip below 25 percent.
When it was time to file their federal income tax returns, Sartisky deducted 75% of the allowable expenses from the house and Slimp deducted 25%.
| RThe house sustained some damage from a tornado after Hurricane Katrina in August 2005. The parties worked together to get the house restored. However, the storm magnified difficulties they were already having between them. In the fall of 2007, it came to Sartisky’s attention that Slimp was incurring a large amount of credit card debt; it was inexplicable to Sartisky because he did not see anything tangible. Slimp also admitted to him that she had not filed income tax returns since 2004. This information concerned Sarti-sky greatly; he was worried that the IRS would come after her only asset, her interest in the Harmony Street house, and their home would be put in jeopardy.
After he learned of the credit card debt, Slimp spoke to him about the situation and the fact that she was unable to keep up with the interest, much less reduce the principal. Sartisky suggested that she obtain a loan with a lower interest rate to pay off the entire debt. Because Slimp’s only asset was her equity in the house, Sartisky agreed to co-sign for a home-equity loan. The loan was made in the beginning of 2006 for over $16,000.00. Slimp made all the payments and the loan was repaid in March 2008.
Sartisky was shown the 16 April 2008 agreement that he entered into with Slimp. In pertinent part, the document states:
8. After June 1, 2008, Mr. Sartisky will pay in full the regular monthly mortgage payments on the first mortgage to Fidelity Homestead, property tax, homeowner’s insurance policy premiums, utilities, and pool cleaning and groundskeeper fees. Mr. Sartisky will not seek reimbursements from Ms. Slimp for any of these expenses in- *909 eurred after June 1, 2008. Likewise, Ms. Slimp will not seek any credits from Mr. Sartisky for his (or his son’s) use and enjoyment of the Harmony Street House after June 1, 2008.
[flAfter reading this paragraph, Sartisky testified that his understanding was that he would not seek reimbursement for those items properly considered expenses for the operation of the house, such as housekeeping, landscaping, the security system, electricity, and water. However, with regard to the mortgage payments, it was his understanding that a mortgage payment is not an expense. He paid $46,682.25 in principal on the loan from 1 June 2008 through December 2010. During the remainder of Sartisky’s direct testimony, he identified other items for which he paid in connection with the Harmony Street house.
Under cross-examination, Sartisky stated that he and Slimp had no written agreement regarding their respective ownership interests in the house or relative to the percentage of expenses they would each pay for maintenance, repairs, and/or improvements to the house. However, before they purchased the Harmony Street house, Slimp contacted an attorney to try and work out an arrangement for ownership of the house. They were unsuccessful in reaching a written agreement.
James Friedman, a certified public accountant, testified for Sartisky. He was engaged to comment on the methodology for determining the amounts of funds to be paid to each investor on the assumed sale of the Harmony Street house. In doing so, he used two different sale prices: $900,000.00 and $1,250,000.00 and assumed a transaction cost of 5%. He was also given percentage of ownership to work with: an equal split of 50/50 and a disproportional split of 75/25, with the larger percentage to Sartisky. The four different scenarios were discussed by Friedman and his report was entered into the record. He used the same methodology he would use for a general partnership accounting; he had never testified in court about a partition as opposed to a partnership.
At the conclusion of Friedman’s testimony, the plaintiff rested his case.
| inHarold Asher, a certified public accountant, testified on behalf of Slimp. In performing his calculations, Asher assigned the house a value of $1,300,000.00 and applied an equal split of 50/50. He presented two different methods to calculate each party’s equity in the property; both methods resulted in the same numbers. He believed that Sartisky should receive one-half of the amount of reimbursements claimed rather than 100% as testified to by Friedman. Certain exhibits created by Asher were proffered in the record.[6]
The final witness to testify was Slimp. She stated that she and Sartisky began dating in 1993 or 1994. By about 1996, she began residing with him and his son, even though she owned a house in Old Metairie. Sartisky’s son, Joshua, was about five years old when they began dating. She had a very good relationship with Joshua; he referred to her as “his other mom.” She and Joshua’s mother are friends.
At some point in time, Slimp and Sarti-sky agreed to purchase a home together. This occurred after Sartisky had given her a diamond ring. Specifically, Slimp stated:
*910 Your Honor, as I explained earlier, in this situation, we started off — I wouldn’t have purchased a house with Mr. Sarti-sky without the promise of — well, we weren’t engaged — without the promise of some kind of marriage or future life together.
In connection with their looking for a house, she and Sartisky consulted an attorney to obtain a written ownership agreement but did not execute one. However, she never agreed that the ownership of the Harmony Street house would be anything other than 50/50. Although Sartisky paid more than 50% of theJjjexpenses, according to Slimp, they were living together as a family unit sharing expenses according to their income and ability as well as the workload that a family does when living in a house. Slimp acknowledged that her income was different from Sartisky’s. In addition, she testified that Sartisky said that he would assume more of the expenses because he was paying for his son as well as himself.
The maximum price she agreed to pay for the Harmony Street house was $850,000.00. However, the lowest price Sartisky could negotiate was $860,000.00; Sartisky paid the additional $10,000.00 because he didn’t want to lose the house for that amount and stated that he would be responsible for the overbid. According to Slimp, Sartisky never expected her to pay back the money to which she had not agreed.
When Slimp sold her Old Metairie house, the proceeds, $197,372.90, went directly to pay down the mortgage on the Harmony Street house. However, she was concerned that she did not have any money of her own. Sartisky gave her what she assumed to be a gift of two checks for $5,000.00 each, or a total of $10,000.00; Sartisky never said that she had to repay the money. Although Sartisky testified that the amount was $15,000.00, Slimp was unable to find a third deposit of $5,000.00.
While living in the Harmony Street house, Slimp incurred some credit card debt purchasing things for the house for which she never sought reimbursement. She considered the items to be “consumable/removable things,” such as lamps, bedding, dishes, etc. Sartisky knew she was buying these items, but she never told him that she was placing the purchases on her credit cards. The amount of debt totaled approximately $17,000.00. Eventually, she could not keep up with payments and the exorbitant interest rates. She consulted with Sartisky and he |12agreed to co-sign for a home-equity loan to pay off the credit cards. Slimp made all the necessary payments and paid off the loan. She was not claiming reimbursement for the $17,000.00 she spent on the house.
In connection with her tax returns, Slimp admitted that she did not file every year, but once she did, she received a refund and did not incur any penalties or fines for late filing.
In the latter part of 2007, the love relationship between Slimp and Sartisky ended.[7] Sartisky wanted her to leave the Harmony Street house, but Slimp was not going to vacate until they had a financial settlement. Sartisky’s attorney made the first proposal of an agreement what resulted in the 16 April 2008 document that she signed. As a result of the signing, Slimp vacated the house. Slimp has lived up her part of the agreement by not seeking reimbursement for Sartisky’s and his son’s use and enjoyment of the house after 1 June 2008, the date she moved out. She asserted that had she known that Sartisky would seek reimbursement for principal payment *911 reductions on the mortgage after she vacated the residence, she would not have left.
Regarding the mortgage interest deductions on their respective tax returns, Slimp deducted 25% of the interest while Sarti-sky deducted 75%. She agreed to this as a way to equalize some of the expenses and help him reduce his tax liability. Since Sartisky was paying more for his son and was in a higher tax bracket, he would get the higher deduction. However, she did not agree that the mortgage interest deductions would in any way affect the ownership interest in the house. Likewise, she did not take any part of the deductions for property taxes and/or mortgage interest after she left on 1 June 2008. The agreement of 16 April 200811sprovided that Sartisky would be responsible for all expenses and payments after she vacated the property.
The remainder of Slimp’s direct testimony was focused on the various exhibits prepared by the parties on reimbursements claimed and disputed. Slimp stipulated to the amounts paid by Sartisky but not to whether all the expenses were necessary and, thus, subject to reimbursement.
Under cross examination, Slimp admitted that she testified in her deposition that as to the $10,000.00 additional purchase price, it was her understanding that Sarti-sky would get the money back from the proceeds once the house was sold. She also admitted that, in her answer to interrogatories, she received $15,000.00, not $10,000.00, as a gift from Sartisky after the sale of her Old Metairie house. However, she was unable to find any evidence that she in fact received $15,000.00 at the time of trial.
Slimp reiterated that she would not have purchased a house with Sartisky without a promise “of some kind of marriage or future life together.” She had been living in her Old Metairie home for over 20 years; the equity in her house was all the money that she had. In addition, Sartisky would not have qualified for the loan unless he came up with an equal amount of money, which was the contribution of the proceeds from the sale of her house.
The trial court rendered judgment with incorporated reasons for judgment on 5 May 2011. The court found that Sarti-sky’s ownership interest in the property was 75%, while Slimp owned the remaining 25%.[8] The court also decreed that | u“the amounts stipulated to at the deposition are the amounts the Plaintiff paid. These expenses are hereby determined to be expenses for which reimbursement is allowed.”
The court partially vacated the 16 December 2008 interlocutory judgment. It held that the Entergy, Sewerage and Water Board, and telephone expenses were necessary; thus Sartisky could recover the amounts paid for these items. The remainder of the judgment was in full force and effect. This meant that Sartisky could also be reimbursed for the alarm system’s monitoring, landscaping, and pool chemical expenses. The court also found that the 16 April 2008 “listing agreement” had expired and was not applicable to the proceedings.
The court adopted the accounting methodology proposed by Slimp’s accountant, finding that it was the correct method for determining the amount of money that *912 each party was to receive from the sale of the property. The court also ordered Slimp to pay an additional $10,000.00 to Sartisky from the sale of the property for the payment made to Slimp after the initial down payment.
Finally, with regard to the property itself, the court ordered that it be sold at public auction with an initial minimum bid of $942,500.00; if not sold, the next initial minimum bid would be $627,705.00. In addition, the court appointed a notary for the sale of the property.
The court’s written reasons for judgment were made a part of the judgment.[9] In the reasons, the court primarily relied on the parties’ tax returns wherein Sarti-sky claimed 75% of the mortgage interest for five years and 100% for one year. Furthermore, the court stated that Sarti-sky’s original down payment was | ^essentially two-thirds of the total and that his payments on the mortgage and expenses for maintaining the house substantially exceeded Slimp’s payments.
The court then examined the “cause”[10] behind the parties’ agreement to purchase the Harmony Street house:
As to the second determination, there is no question that part of the cause behind why both of these individuals entered into the arrangement to buy the Harmony House was their desire to live with each other in an arrangement that Slimp called a “family unit,” which this Court views as nothing more than an attempt to enjoy the benefits of marriage without actually being married. Both of these parties are sophisticated people who should have understood the risks of such a venture. Slimp previously was a real estate agent and Sartisky is president of the Louisiana Endowment for the Humanities. Be that as it may, while both of them should have known of the risks, this Court finds that when examining the cause behind these individuals agreement to purchase the property, that this element of the analysis also favors rebutting the presumption. In coming to this view, the Court looks to the testimony and the demeanor of both Sartisky and Slimp to determine their primary cause behind buying this property together.
If the parties never intended to get married as Sartisky testified — then Slimp’s legal cause is that she simply wanted to live with Sartisky in a place his child could conveniently travel to and from school, which was his principle legal cause. The Court notes that Slimp fell in love with wanting to purchase the Harmony House while Sartisky was less than eager in the beginning as the parties had looked at over 300 properties and could not find anything to their liking. Sartisky had testified that he even paid an architect to renovate his Marigny Street home prior to looking at thy Harmony House for the second time. Sartisky further testified that his understanding at the time was that Slimp was paying $1,000 per month concerning her mortgage payment, which was exactly the amount she paid from 2002-2007. It would be impossible to believe that Slimp would expect to receive a windfall when she did not pay for the majority of the Harmony House if the parties were up front about not getting married. The fact that Slimp 11fireceived less from the sale of her house than she originally hoped is of no moment to this Court as that has nothing to do with the cause of the contract for either of these sophisti *913 cated individuals. Had it been part of the cause, then Slimp would not have agreed to purchase the Harmony House (especially based upon her previous experience and knowledge as a real estate agent) until selling her Grenadine House first for the amount of money that she believed it would sell for on the open market. The fact that Slimp took a bad deal for the sale of her home would not change the fact that the parties’ knew that their interests were dependent to the amount of money paid on the property.
However, this Court after evaluating Slimp’s testimony gives it some credence as this Court does believe that Sartisky asked her to marry him and she rejected his proposal. This Court is actually under the impression that the parties, who had lived with each other previously, did speak about marriage prior to the purchase of the property. These individuals are extremely sophisticated people who loved each other. Sartisky’s cause for spending more money was based upon the notion that the couple would be spending the rest of their lives as husband and wife. Sartisky is an intelligent individual and does not strike the Court as someone to simply give money away without something in return — and that something was that the parties would be spending the rest of their lives together as husband and wife. Both parties testified that they were already living together prior to the purchase of the property. Because the contemplation of marriage was the cause behind these individuals agreement to purchase the property, how could Slimp expect Sartisky to pay the extra money and get nothing in return if the parties were not going to get married? While the cause of a contract can be gratuitous, neither Slimp’s nor Sartisky’s testimony gives any indication to this Court that Sartisky intended a gratuitous donation at all. This is what the Court believes that the parties’ testimonies establish, and therefore the principles of La. C.C. Arts. 2054 and 2055 must apply, which state as follows:

La. C.C. Art. 2054. No provision of the parties for a particular situation

When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage |17regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.

La. C.C. Art. 2055. Equity and usage

Equity, as intended in the preceding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another.
The law certainly provides that when the act of sale is silent to the interests of the vendees, they are presumed to purchase in equal proportions. However, Slimp had to know that Sartisky was making the majority of the payments for a reason — which was the contemplation of marriage. Both Sartisky and Slimp were involved in raising Joshua (Sartisky’s son) at least three times per week. Sartisky may not have wanted to admit that he loved Slimp to the point of marriage, but this Court is of the impression that he did. Obviously, something happened to change things. While it may have been her credit card debt, the more reasonable scenario is that it was her denial of his alleged proposal for marriage. Sartisky has rebutted the presumption based upon *914 the amount he paid on the mortgage and expenses as well as the fact that neither of the parties could have possibly intended for Slimp to receive a windfall by assuming a 50-50 interest in the Harmony House when the parties were to be married and she reneged on such promise. Therefore, Sartisky is awarded a 75% interest in the home pursuant to his judicial admission on the record that Slimp’s interest would not go below 25%. [Boldface emphasis in original; italics emphasis supplied.]
The court next addressed reimbursements, finding that Slimp had stipulated the amounts of all the categories and figures at her deposition and as presented at trial. The court stated:
The Court is confused by the late addition of the new numbers based upon the following exchange between counsel for both parties at Ms. Slimp’s deposition:
Mr. Cheatwood: Do you contest or have any reason to believe that Dr. Sartisky | isdid not pay these amounts as shown on the spreadsheets?
Mr. Zatzkis: With the exception of the insurance reimbursement.
Mr. Cheatwood: That’s one to be left out.
Mr. Zatzkis: We’ll stipulate to that.
Mr. Cheatwood: Fair enough. With exception to the insurance, we’ll stipulate to it. That answers that.
Mr. Zatzkis: Is that fair enough?
The Witness: Fair Enough.
Mr. Cheatwood: Okay. That’s fine.
Based upon the stipulation between counsel, to come back and now state that the amounts are incorrect would be extremely prejudicial to plaintiff. Plaintiff found no need to go into each-of the expenses at Slimp’s deposition based upon defense counsel’s representation on the record that the amounts were not contested. Now, defendant does contest the amounts, coming up with reasons such as claiming that certain roof repairs were cosmetic — one expense contained purchases for a Tivo and wine cooler, and that some expenses were simply not necessary. As such, the Court will not even entertain the proposed amounts by the defendants [sic] in their post-trial brief other than the insurance amounts.
Furthermore, this Court has articulated at trial its reasons why it vacated Judge Ramsey’s original judgment concerning the defendant’s motion in limine signed on December 16, 2008. Simply put, Entergy, the Sewerage and Water Board and telephone are necessary expenses for the property. If climate is not controlled, the home maybe susceptible to mold and mildew from the humidity levels. If the water is cutoff, the pool may begin to rot. The telephone is necessary to the alarm-monitoring service, which serves to protect the property, especially when neither Sartisky nor Slimp is currently residing at the property. These expenses were on the spreadsheets that were presented at the deposition, which was prior to Judge Ramsey’s judgment ruling as to their admissibility. Therefore, the stipulation applies to these amounts as well. [Emphasis in original.]
The court also found that the expense for the curtains in the house was a proper item for reimbursement.
119The court found Slimp’s accounting more accurate based, inter alia, on the language of La. C.C. art. 806. Relying on relevant jurisprudence from this circuit, the court held that the mortgage payments, while not a reimbursement as an expense under article 806, fall under the law of conventional obligations. Thus, as solidary obligors, Slimp was responsible *915 for her virile share of the mortgage payments Sartisky made on her behalf.
Next the court addressed the alleged $15,000.00 payment made by Sartisky to Slimp after her house sold and all the proceeds therefrom were used to pay down the promissory note held by the financial institution secured by the mortgage. The court recognized that this payment had nothing to do with the reimbursements for the property as the money was for Slimp to have spending money should she need it. The court stated:
The first question this Court must ask is whether the money was a gift or a loan. This Court once again is of the opinion that Sartisky made the payment to Slimp believing that the parties were to be married. While it may seem that asking for that amount of money would be substantial and a possible indicator that Slimp was never going to marry him, these types of arrangements are more common than originally thought. How many times has a significant other paid a car note or credit card for a significant other based upon a promise of marriage? One need only turn to daytime television to see how common of an occurrence it is. This Court based upon both of these individual’s testimonies believes that the parties did speak of and contemplate marriage prior to this arrangement. Slimp cannot be unjustly enriched from such an arrangement when she knew the cause of Sartisky’s payment of the money. Therefore, she is required to repay to Sartisky the entire amount of spending money she was paid after the initial down payment. La. C.C. Art. 2055. [Italics supplied.]
[ ^However, the court held that Sartisky failed to prove at trial that he paid Slimp the total sum of $15,000.00. As such, the court set the amount at $10,000.00.
The court then considered the 16 April 2008 agreement that Slimp argued prevented Sartisky’s claims for reimbursement after 1 June 2008. Slimp relied on paragraph 8 of the joint agreement which stated:
After June 1, 2008, Mr. Sartisky will pay in full the regular monthly mortgage payments on the first mortgage to Fidelity Homestead, property tax, homeowner’s insurance policy premium, utilities and pool cleaning and groundskeeper fees. Mr. Sartisky will not seek reimbursement from Ms. Slimp for any of these expenses incurred after June 1, 2008. Likewise, Ms. Slimp will not seek any credits from Mr. Sartisky for his (or his son’s) use and enjoyment of the Harmony St. House after June 1, 2008.
However, the court found that the agreement had expired when the house did not sell within ninety days from the date of the agreement. The court also referenced the pleadings wherein both parties admitted that the agreement had expired.[11] Therefore, the court gave no credence to Slimp’s argument that Sartisky was owed nothing after 1 June 2008 since the agreement was no longer in effect after those ninety days.
Finally, the court set forth an accounting whereby, based on a sale price of $942,500.00 and after the deduction of the sheriffs commission, payoff of the mortgage, reimbursements owed by Slimp, and the extra payment by Slimp of $10,000.00, Sartisky would receive a distribution of equity in the amount of $578,971.54, for his 75% interest in the house, while Slimp would receive $163,145.49 for her 25% interest in the property.
*916 |P1 Slimp filed a timely appeal from the judgment alleging numerous errors by the trial court. Sartisky timely answered the appeal asserting one error regarding the trial court’s application of the methodology of the funds received from a sale of the house. While this case was pending, the house did, in fact, sell for the amount of $942,500.00. After the deduction of fees and the payoff of the remaining mortgage, the proceeds to be split between the parties are $800,677.28.
Before we address the errors alleged by the parties, we will discuss the standard of review. As Sartisky points out, it is well-settled that a trial court has broad discretion in adjudicating issues raised by the partition of a community of acquets and gains, which, of course, did not exist here. A trial judge is afforded a great deal of latitude in arriving at an equitable distribution of the assets between co-owners. However, the allocation or assigning of assets and liabilities in the partition of property is reviewed under the abuse of discretion standard. Legaux— Barrow v. Barrow, 08-530, p. 5 (La.App. 5 Cir. 1/27/09), 8 So.3d 87, 90, writ not considered, 09-0447 (La.4/13/09), 5 So.3d 152. It is further settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and “where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The Rosell court continued:
When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective | ^evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Id. at 844-45. [Internal citations omitted.]
After reviewing the transcript, we find numerous factual errors contained in the trial court’s judgment and written reasons. We begin with the written reasons as it contains such substantial factual errors that the judgment is interdicted in its entirety. While we appreciate that trial court’s ability to listen to the testimony and make credibility determinations, not one shred of evidence exists to support the finding that any of Sartisky’s actions were done in contemplation of marriage. Although the trial court found it is fact, we cannot find anywhere in the trial transcript that Sartisky ever asked Slimp to marry him and she rejected his proposal. In fact, Sartisky emphatically deified that he wanted to marry Slimp based on his previous divorce experience. However, these findings, based on the parties’ failure to state so during trial, underlie virtually all of the court’s subsequent decisions from ownership interests in the Harmony Street house to reimbursements owed by Slimp to Sartisky.
*917 We find other factual errors. For example, the court held that the amounts of the reimbursements submitted by Sartisky were stipulated to by Slimp, relying on the exchange of counsel set forth above. It is true that Slimp stipulated that the amounts set forth in Sartisky’s ledgers were the sums actually paid by him. However, nowhere does Slimp stipulate that all the items are reimbursable under | giLa. C.C. art. 806 as “necessary.” Thus, the trial court erred by excluding any and all evidence presented by Slimp in this regard.
Another factual error involves the 16 April 2008 agreement. Specifically, the court states that the “silver bullet” comes from paragraph 28 in Sartisky’s supplemental petition, as well as Slimp’s answer to said petition, wherein both parties admit that the agreement has ended. Paragraph 28 states that “[t]he parties confidential agreement to list the Harmony Street House has expired,” to which Slimp agrees. However, the court fails to note that the agreement in question addressed additional issues aimed at Slimp vacating the house on 1 June 2008 and the financial repercussions resulting therefrom.
This particular factual error leads to an error of law as well. By failing to recognize that the 16 April 2008 agreement addressed issues other than the private sale of the Harmony Street house, the court did not consider whether the paragraphs relied upon by Slimp were severa-ble from the rest of the agreement. This agreement was a binding contract between the parties, however, the court failed to apply the appropriate legal principles governing contracts, an issue we will address infra.
For these reasons, we find that the court was manifestly erroneous and clearly wrong in making her findings of fact, despite the great deference we accord them. Consequently, we shall apply a de novo standard of review and render judgment based on the appellate record before us.
We begin with the parties’ respective ownership interests in the house. La. C.C. art. 797 provides “[ojwnership of the same thing by two or more persons is ownership in indivisión. In the absence of other provisions of law or juridical act, the shares of all co-owners are presumed to be equal.” However, it has been | ^recognized that the presumption is rebuttable and that a court may consider the amount and consideration contributed by the parties when determining the percentages of ownership. See e.g., Manning v. Harrell, 59 So.2d 389, 390 (La.App. 2nd Cir.1952); Succession of LeBlanc, 577 So.2d 105, 108 (La.App. 4th Cir.1991).
After examining LeBlanc, however, the trial court was of the impression that this court intended to use the legal standard of “cause” under La. C.C. art. 1967, rather than the “often misused” (the term used by the court below) term of consideration. The court relied on the First Circuit case of Aaron & Turner L.L.C. v. Perret, 07-1701, pp. 7-8 (La.App. 1 Cir. 5/4/09), 22 So.3d 910, 915, writ denied, 09-1148 (La.10/16/09), 19 So.3d 476, quoting it as follows:
Our review of the pertinent Louisiana Civil Code articles and the record presented herein leads us to conclude that the parties and the trial court were misguided in examining the validity of the promissory note and mortgage at issue herein from the perspective of “consideration.”
“An obligation cannot exist without a lawful cause.” LSA-C.C. art. 1966 (emphasis added). “Cause is the reason why a party obligates himself.” LSA-C.C. art. 1967 (emphasis added). The *918 comments to Article 1967 state, in pertinent part:
Under this Article, “cause" is not “consideration.” The reason why a party binds himself need not be to obtain something in return or to secure an advantage for himself. An obligor may bind himself by a gratuitous contract, that is, he may obligate himself for the benefit of the other party without obtaining any advantage in return.
LSA-C.C. art. 1967, Comment (c) (emphasis added).
Louisiana does not follow the common law tradition that requires consideration to effect an enforceable contract. Rather, the mere will of the parties will bind them, without what a common law court would consider to be consideration to support a contract, so long as the parties have a lawful “cause.” The cause need not 12shave any economic value. Sound/City Recording Corp. v. Solberg, 443 F.Supp. 1374, 1380 (D.C.La.1978).
Unlike the common law analysis of a contract using consideration, which requires something in exchange, the civil law concept of “cause” can obligate a person by his will only. The difference has been analogized to a civilian contract-consent approach compared to a common law contract-bargain approach. Consideration is an objective element required to form a contract, whereas cause is a more subjective element that goes to the intentions of the parties. Therefore, in Louisiana law, a person can be obligated by both a gratuitous or onerous contract. Bains v. Young Men’s Christian Association of Greater New Orleans, 2006-1423, p. 5 (La.App. 4 Cir. 10/3/07), 969 So.2d 646, 649, writ denied, 2007-2146 (La.1/7/08), 973 So.2d 727.
Consequently, the trial court looked both to the amount spent by the parties as well as the legal cause behind the co-purchase of the property to determine whether the presumption of equal owners applied.
The trial court placed considerable importance on the 75/25 split of household deductions on the parties’ respective tax returns. We do not. The parties are free to deduct whatever they deem appropriate, provided that the total does not exceed 100% and do not violate law. The fact that a 75/25 split was agreed to by Sartisky and Slimp does not mean that their ownership interests in the Harmony Street house follows suit. As Slimp explained, Sartisky paid more of the expenses, partly because of the disparity in their incomes, but also because Sartisky’s son lived with them 50% of the time. Slimp thought the 75/25 split was reasonable in light of these factors; this does not automatically mean that her interest in the house was affected.
Looking behind the finances, the testimony was clear that the parties purchased a home together because they wanted to live together. But such does not per se mean that they wanted to be married to each other. They loved one ^another and wanted to share their lives together. This was not a sudden decision; they had been dating since 1993 or 1994. By sometime in 1995, Slimp was living with Sartisky and his son, although she owned her own home. The decision to purchase the property on Harmony Street was made in 2001. As the court noted, both of the parties are sophisticated people and it does not appear that they made the decision to sell their respective homes and purchase property together rashly or without considered thought. This was the primary legal cause underlying the purchase of a common home.
*919 As for the purchase of this particular house, Sartisky testified that he wanted to purchase property that was closer to his son’s uptown New Orleans school and growing social activities. After looking at over 300 houses, Sartisky had given up hope of finding what they wanted and was considering remodeling his current house to suit their needs. Although he reluctantly toured the Harmony Street house, he testified that he liked the house very much and wanted to purchase it. Consequently, they did.
The trial court found it impossible to believe that “Slimp would expect to receive a windfall when she did not pay for the majority of the Harmony House if the parties were up front about not getting married.” Further, the court, after evaluating Slimp’s testimony, believed that Sar-tisky asked her to marry him and she rejected the proposal. No testimony of any such nature exists. Actually, Slimp testified that she would not have sold her home and purchased property with Sarti-sky without a promise of marriage or a future life together. It is undisputed that Sartisky gave Slimp a diamond ring; the ring can be viewed as evidence of that |27promise.[12] It was Slimp who kept referring to Sartisky, his son, and herself as a “family unit.”[13] It is inconceivable that this sophisticated woman would invest her entire life savings in a house, clearly beyond her financial means, had she known that at the end of the relationship, she would be left virtually broke. Obviously, when the parties purchased this house, they intended to be together “forever” as a family unit, even though they agreed not to be married.
The parties were well aware of the disparity in their financial means well before the house was purchased. In fact, they had been essentially living together for approximately six years when they decided to purchase a home together. We believe that when Sartisky told her that she would not have to contribute any more than she was already paying for her Old Metairie home, he meant that; he did not mean that she would eventually owe him thousands of dollars in reimbursements. We find that the trial court erred in finding that everything Sartisky did and/or paid was in contemplation of marriage or that Slimp rejected his proposal of marriage. We find that the parties intended to own the house indivisión, or that each would own 50%. Therefore, Slimp is entitled to 50% of the proceeds from the sale of the Harmony Street house, once each party’s initial contribution is deducted.
We now address reimbursements and the other remaining issues presented in this appeal. Before doing so, however, we address the 16 April 2008 agreement which the trial court found had expired. The trial court was partly correct.
Contracts have the effect of law for the parties. La. C.C. art. 1983. In interpreting contracts, we are guided by the general rules contained in La. C.C. | ^arts. 2045-2057. Subject to the limits imposed by law, parties are free to contract as they choose. Zeigler v. Pleasant Manor Nursing Home, 600 So.2d 819, 822 (La.App. 3rd Cir.1992). The cardinal rule, as set forth in La. C.C. art. 2045, is: “Interpretation of a contract is the determination of the common intent of the parties.” See Amend v. McCabe, 95-0316, p. 7 *920 (La.12/1/95), 664 So.2d 1183, 1187; McCrory v. Terminix Service Co. Inc., 609 So.2d 883, 885 (La.App. 4th Cir.1992). When they are clear and explicit, no further interpretation may be made in search of the parties’ intent. Amend, p. 7, 664 So.2d at 1187; McCrory, 609 So.2d at 885.
Relative to the nullity of a provision of an agreement, La. C.C. art. 2034 provides:
Nullity of a provision does not render the whole contract null unless, from the nature of the provision or the intention of the parties, it can be presumed that the contract would not have been made without the null provision.
According to the 1984 Revision Comments, the above article “directs the court to consider the totality of the parties’ intentions before annulling the agreement when only a portion of it is null.” La. C.C. art. 2034, 1984 Revision Comment. Accordingly, like other questions of contract interpretation, whether an agreement is severable is controlled generally by the intent of the parties as expressed by the contract terms and/or language. Hudson v. City of Bossier City, 05-0351, p. 20 (La.4/17/06), 930 So.2d 881, 894.
Turning to the 16 April 2008 agreement, we agree with the trial court that Lathe 90-day listing agreement had expired by 16 July 2008 and could not be applied to offers to purchase the home after its expiration date. However, we find that the provisions of the contract drawn by Sartisky relating to the fisting and sale of the Harmony Street house are severable from the paragraphs of the contract that did not address the listing and sale, in particular, paragraphs seven and eight, which provide:
7. Ms. Slimp agrees not to be present at the house from April 30,1998 [sic] tp May 5, 2008. Further, Ms. Slimp shall vacate as a domicile the Harmony Street House on or before June 1, 2008, returning keys to Mr. Sartisky, who will have the exclusive right to use the Harmony Street House. All of Ms. Slimp’s possessions must be removed no later than June 1, 2008, and Ms. Slimp will not otherwise seek to use the Harmony Street House after June 1, 2008. Ms. Slimp, however, shall remain a co-owner of the Harmony Street [house].[14]
8. After June 1, 2008, Mr. Sartisky will pay in full the regularly monthly payments on the first mortgage to Fidelity Homestead, property tax, homeowner’s insurance policy premium, utilities, and pool cleaning and groundskeeper fees. Mr. Sartisky will not seek reimbursement from Ms. Slimp for any of these expenses incurred after June 1, 2008. Likewise, Ms. Slimp will not seek any credits from Mr. Sartisky for his (or his son’s) use and enjoyment of the Harmony Street House after June 1, 2008.
The parties each signed the contract, agreeing to the foregoing terms and effective on April 16, 2008.
The trial court erred in finding that the entire contract had expired.[15] We find that paragraphs seven and eight did not expire and remained binding upon the parties.
*921 lanThe second disagreement concerns paragraph eight, wherein the mortgage payments are referred to as “expenses.” The law is settled that under La. C.C. art. 806, a co-owner who has incurred necessary expenses or maintenance and management expenses is entitled to reimbursement from the other co-owners. However, a mortgage is not such an expense; it is “a nonpossessory right created over property to secure the performance of an obligation.” La. C.C. art. 8278.
In this case, however, Sartisky freely waived reimbursement for all of the enumerated items, regardless of what constituted a reimbursable expense under La. C.C. art. 806. This waiver benefited him in two ways. First, as Slimp testified, without the waiver, she would not have moved out of the Harmony Street house. Second, she waived her right to seek credits for his and his son’s use and enjoyment of the house and/or rent. We find that the waivers made by the parties in paragraph nine constitute the law between them.
Finally, before addressing the specific reimbursements claimed by the parties, we note that the trial court vacated the judgment concerning Slimp’s motion in limine signed on 16 December 2008. The court found that some of the listed items, such as electricity, water, sewerage, and telephone were necessary expenses for the property and could be reimbursed under La. C.C. art. 806, which provides:
A co-owner who on account of the thing held in indivisión has incurred necessary expenses, expenses for ordinary maintenance and repairs, or necessary management expenses paid to a third person, is entitled to reimbursement from the other co-owners in proportion to their shares.
If the co-owner who incurred the expenses had the enjoyment of the thing held in indivisión, his reimbursement shall be reduced in proportion to the value of the enjoyment.
|,-itWhile we find that the trial court was well within its discretion to vacate the December 2008 judgment, we do not agree with all the expense items for which she reimbursed Sartisky.
The comments to article 806 indicate that it is a new provision, but that it expresses principles inherent in the Civil Code of 1870. The comments also refer to La. C.C. arts. 527 and 528 for the definition of “necessary expenses” as distinguished from “useful and luxurious expenses.” Under article 527, “necessary expenses” are “incurred for the preservation of the thing and for the discharge of private or public burdens.” As explained in Comment (b) to article 528, “useful expenses” are those that result in an enhancement of value, but are not needed for the preservation of the property.
We are particularly guided by this court’s decision in Seddon v. Simpson, 01-2378 (La.App. 4 Cir. 4/17/02), 816 So.2d 915, a case that is analogous with the one sub judice. There, the parties were romantically involved for a number of years during which they lived in a communal household. In that household, the items and responsibilities were shared. It was not until the romantic relationship broke down that Seddon decided to go back through her records and find out which bills could be attributed solely to Simpson, classifying them as “loans,” for which Simpson owned repayment. The trial court rejected that division of expenses, finding as a fact that the parties were living together and sharing expenses. The trial court found, “the truth is that when the two of them were living together, they were both spending and incurring bills for the benefit of the both of them.” The parties anticipated getting married and already had a child together. The court *922 refused to separate the various payments, finding no legal basis for identifying any 13gof the bills as being for Simpson’s exclusive benefit. Id., pp. 3 and 18, 816 So.2d at 917 and 924. We affirmed on appeal, finding no error in the trial court’s conclusions.[16]
In the instant matter, the daily household expenses were for the benefit of the communal household, consisting of Sartisky, Slimp, and Sartisky’s son. The expectation was that they were going to spend the rest of their lives together. The parties knew from the very beginning that Slimp’s income was considerably less than Sartisky’s. Both parties purchased items for the home, including curtains, lighting fixtures, and landscaping materials. The daily household expenses also included electricity, telephone, and water and sewerage. We agree that these communal expenses are not separable and, therefore, not reimbursable under article 806.[17]
However, there are some items for which Sartisky is owed reimbursement at 50% of what he paid and only until 1 June 2008, the date Slimp vacated the property. These are the sums paid to ADT (security alarm services), A-Z (renovations on the property less the amounts paid after Hurricane Katrina), electrical work, Guarantee Sheet Metal Works (repairs to the roof), refinancing charges, homeowner’s insurance premiums (prorated to exclude the amounts paid after 1 June 2008), plumbing repairs, property taxes (again, prorated to exclude the Issamounts paid after 1 June 2008), home heating and air conditioning repairs (again, less the amounts paid after the hurricane), and Terminex (pest control).
We do not find the following categories as being necessary to the preservation of the property: carpet, chandelier, curtains, floors, housekeeper, and pool services. While these items may add to the value of the house, such does not equate with “necessary.” Pursuant to Seddon, we find that the amounts paid to Entergy (electricity), the New Orleans Sewerage and Water Board, and telephone services are not reimbursable. Sartisky cannot claim reimbursement for the mortgage payments made after 1 June 2008, as these were waived in the 16 April 2008 agreement. As for the landscaping, we appreciate that if the lawn is not mowed periodically, an owner can be cited by the City of New Orleans for violating Section 66-313 of the New Orleans Municipal Code.[18] However, no evidence was presented to *923 separate grass cutting from the other landscaping services; therefore, we have excluded the total amount. Finally, while painting might be a necessary expense to preserve the property, no evidence is in the record to support same; again, this amount has been excluded. We find that Sartisky’s reimbursable expenses total $47,202.91.
After reviewing the expenses for which Slimp sought reimbursement, we have excluded all the landscaping monies paid, as well as those sums spent at Clearwater Pools and Home Depot. Thus, Slimp may claim $2,487.75 in reimbursable expenses.
| ^Finally, before we allocate the funds we find are due to each party, we address the $10,000.00 given by Sartisky to Slimp after she applied the proceeds from the sale of her Old Metairie home to the promissory note on the house at issue. The trial court found that Slimp was required to repay Sartisky the entire amount of the spending money because: it believed, based upon the testimony that “the parties did speak of and contemplate marriage prior to this arrangement. Slimp cannot be unjustly enriched from such an arrangement when she knew the cause of Sartisky’s payment of the money.” Again, we find no reference to marriage other than what we have already quoted herein. We find that the money was a gift and that no repayment is necessary.
We disagree with the accounting methodology presented by both experts. First of all, we now have the figure of net proceeds from the sale of the Harmony Street house: $800,667.28. From that sum, we first deduct the initial investment made by the parties in the house: for Sartisky, $535,248.00 and for Slimp, $197,372.90; that leaves a balance of $68,051.38, which we divide between the parties, each receiving $34,025.69. Giving each party credit for their reimbursable expenses, results in the total sum of $613,983.85 for Sartisky and $186,683.43 for Slimp.
We now turn to the answer to the appeal filed by Sartisky. He argues that the trial court erred in accepting the defendant’s expert’s accounting method to divide the funds from the sale of the house. However, we find this assignment of error without merit as we decline to the follow the methodology of either expert.
In the consolidated case, Slimp has appealed from the dismissal of her lawsuit against Sartisky based on res judicata. This appeal is closely entwined with Slimp’s final assignment of error: that the trial court wrongly struck her | ¡^amended answer and reconventional demand against Sartisky for breach of contract and abuse of right claims. We address the arguments together.
First, it is well-settled that a trial court is vested with inherent power to maintain control of its docket. Boykins v. Boykins, 04-0999, p. 5 (La.App. 4 Cir. 4/24/07), 958 So.2d 70, 74. This case had been pending for some time before Slimp filed for leave to file her amended petition and reconventional demand. We note that the trial court specifically found that Slimp was in bad faith for filing the pleading as late as she did. Based on the record, we cannot say that the trial court abused its discretion by rescinding the order giving Slimp leave to file the reconventional demand. In fact, the court’s order is supported by the record.
On 25 August 2008, Slimp filed a motion for a status conference and to have the house sold at private sale, thereby seeking to force Sartisky to accept an offer to purchase the Harmony Street house from an interested third-party purchaser. The motion, which was filed under seal, alleged that on 5 June, 10 June, and 17 June 2008, a third-party purchaser offered increasing *924 amounts to buy the Harmony Street house; Sartisky refused to accept any of the offers. Those offers expired as did the listing agreement. However, the motion alleged that the previous bidder was still willing to purchase the Harmony Street house and had been approved for financing; Sartisky refused to “entertain selling the property.”[19] Sartisky opposed the motion and, for reasons not apparent from the record, the motion was denied as moot.
Thus, Slimp knew by August 2008 that Sartisky had allegedly breached the 16 April 2008 listing agreement and that he intended to pursue a judicial partition. IsfiTherefore, no reason for delay existed to wait until after the pre-trial conference to file the amended answer and reconventional demand. We find no error or abuse of discretion in the trial court’s refusal to allow the reconventional demand to be filed.
However, after reviewing the record and testimony at trial, we find that Slimp could not have prevailed on her reconventional demand, even if it had been allowed and tried. No evidence exists that the parties received a “non-contingent, cash offer” to purchase the house.[20] The documents attached to the motion for status conference indicate that the offers were neither non-contingent nor cash offers. Therefore, Sartisky was free to refuse any of the offers that were made. In addition, under those circumstances, Sarti-sky cannot be accused of an abuse of rights claim when he asserted a claim given him by the law.
Any co-owner has a right to demand partition of a thing held in indivisión. La. C.C. art. 807. The mode of partition may be determined by agreement of all co-owners, in the absence of which a co-owner may demand judicial partition. La. C.C. art. 809. When the thing held in indivisión is not susceptible to partition in kind, the court shall decree a partition by licitation or by private sale, and the proceeds shall be distributed to the co-owners in proportion to their shares. La. C.C. art. 811. Thus, Sartisky was well within his right to seek partition once the listing provisions of the agreement expired as provided by the agreement itself.
The second action was filed on 3 February 2011, during the litigation of the original suit. On 16 May 2011, Sartisky filed exceptions of res judicata and no 137eause of action seeking dismissal of Slimp’s lawsuit asserting claims of breach of contract, fraud, and abuse of rights. The trial court dismissed the separately filed suit with prejudice based on res judi-cata on 22 August 2011, finding that the new lawsuit asserted causes of action which arose “out the transaction or occurrence which was the subject matter of the first action.”
Pursuant to La. C.C.P. art. 1061 B, a “defendant in the principal action ... shall assert in a reconventional demand all causes of action that he may have against the plaintiff that arise out of the transaction or occurrence that is the subject matter of the principal action.” In other words, if the cause of action arises out of the same transaction or occurrence being sued upon, the reconventional demand is compulsory. Here, the breach of contract *925 and abuse of rights claims arise out of the partition of the house. The listing agreement was an attempt by the parties to sell the house before the judicial partition took place, thereby creating the possibility that they would make more money from the sale. In addition, in the abuse of rights claim, Slimp argues that, because the house could have sold for a greater price to the benefit of the parties, Sartisky actions in continuing with a judicial partition constitute an abuse of rights. Clearly, this cause of action arises out of the same transaction or occurrence as the cause of action in the first suit, namely partition by licitation. Any attempted distinctions made by Slimp on appeal fail.
Thus, res judicata attached to the second suit once the trial court rendered judgment in the first, per La. R.S. 13:4231 which provides in pertinent part:
IssExcept as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
(1)If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
In Burguieres v. Pollingue, 02-1385, p. 8 (La.2/25/03), 843 So.2d 1049, 1053, the Court set forth five criteria that must be met for a matter to be considered res judicata. They are: (1) the judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation. We find that the criteria are met in this case.
We note that La. R.S. 13:4232 provides exceptions to res judicata:
A. A judgment does not bar another action by the plaintiff:
(1) When exceptional circumstances justify relief from the res judicata effect of the judgment;
(2) When the judgment dismissed the first action without prejudice; or,
(3) When the judgment reserved the right of the plaintiff to bring another action.
However, after reviewing the record, we find that none of the above enumerated situations apply. Therefore, we affirm the judgment of the trial court in dismissing the lawsuit brought by Slimp against Sar-tisky -with prejudice.[21]
|39Based on the foregoing, we reverse the trial court and render judgment as follows: out of the net proceeds from the sale of the Harmony Street house of $800,677.28, Michael J. Sartisky is awarded the sum of $613,983.85 and Margaret K. Slimp is awarded the sum of $186,683.43. We further affirm the trial court’s judgment dismissing the new lawsuit by Slimp against Sartisky with prejudice on the basis of res judicata. Each party is to pay his/her own costs.

*926
AFFIRMED IN PART; REVERSED IN PART; RENDERED.

. The record does not reflect when the relationship ended, however, Sartisky filed suit against Slimp to partition the house in mid-February, 2008.

. Although we are not handwriting experts, it appears to the untrained eye that Sartisky’s counsel inserted all of the cutoff dates on the scheduling order.

. The abuse of rights doctrine is a civilian concept which is applied only in limited circumstances because its application renders unenforceable an individual’s otherwise judi-daily protected rights. Johnson v. KTBS, Inc., 39,022 (La.App. 2 Cir. 11/23/04), 889 So.2d 329. This doctrine applies when one of the following conditions is met: "(1) the predominant motive for exercise of the right is to cause harm; (2) there is no legitimate motive for exercise of the right; (3) exercise of the right violates moral rules, good faith, or elementary fairness; or (4) exercise of the right *907 is for a purpose other than that for which it was granted.” Id., p. 8, 889 So.2d at 334.

. Sartisky had joint custody and joint domicile with Joshua’s mother. Under that arrangement, Joshua spent about three nights a week with his father and Slimp.

. Under cross-examination, Sartisky admitted that he received a refund of $27,477.00 from the $50,000.00 deposit, resulting in a net payment of $22,523.00 made by him.

. Because we disagree with the methodology of both expert witnesses, we do not delve into the specifics of their testimony.

. The reason the relationship ended is never explained by either of the parties.

. Actually, the trial court stated that Sarti-sky's ownership interest "is valued at 75% of the property and [Slimp’s] ownership interest is valued at 25% of the property.” Arriving at percentages of interest in a piece of property is not a "valuation” of the property, which would be expressed as a dollar amount.

. Reasons for judgment by law are not supposed to be part of a judgment. La. C.C.P. art. 1918.

. See La. C.C. art. 1967, etseq.

. As noted earlier, the parties had agreed that the "listing” agreement had expired.

. This could be viewed as a gratuitous contract, defined as "when one party obligates himself towards another for the benefit of the latter, without obtaining any advantage in return.” See La. C.C. art. 1910.

. In fact, based on the testimony, it appears that Slimp, not Sartisky, was hoping that someday they would eventually be married.

. It is interesting that the contract states that Slimp "shall remain a co-owner” without specifying her percentage of ownership, which Sartisky insists was agreed by them to total 25%.

. Otherwise one could argue that after 15 July 2008, Slimp would be permitted to move back into the Harmony Street house. Clearly, the parties never intended for that result.

. The Seddon court also stated: "The parties decided for their own reasons not to take advantage of the legal rights provided for persons entering into a valid marriage with respect to acquisition and ownership of property and allocation of debts and assets upon dissolution of marriage.” Id., pp. 18-19, 816 So.2d at 924. The trial court in the case at bar also commented on the risk Slimp and Sartisky were taking by purchasing a house together without the benefit of marriage.

. The testimony also revealed that the parties had been living together in Sartisky’s house for approximately six years before they decided to sell their respective homes and purchase property together. Because the testimony indicates that Slimp could not pay any more than she was already spending on her Old Metairie house, we doubt and do not find that Sartisky was "billing" her for living with him on Marigny Street.

.Section 66-313 provides in pertinent part:
It shall be the duty of every owner of real estate within the city to at all times cut and mow the grass and weeds on their respective lots and in the space between the property line and the curbline in front and in the rear and alongside thereof, so that neither grass nor weeds shall rise above the height of 18 inches, and every property owner shall remove cuttings or mowings and any trash, debris, refuse, or discarded matter from his property.

. Sartisky also offered to purchase the house, but he and Slimp could not reach an agreement regarding the amount of money that would be deposited into the registry of the court pending the resolution of ownership interest questions and reimbursements.

. Paragraph three of the 16 April 2008 agreement is clear and unambiguous. If the parties wanted contingent offers to be considered, the contract could have and should have so stated.

. Sartisky also filed an exception of no cause of action but did not address the exception in his brief, which was solely devoted to the res judicata doctrine. Consequently, when the trial court rendered judgment, it made no mention of the no cause of action exception. In any event, we find that no cause of action exists, based on the discussion above. First, it is neither alleged nor proven that any of the offers were non-contingent cash offers and, second, Sartisky was well within his rights in seeking a judicial partition.