DREW, J.
11 Josephine Douglas-Peters appeals a judgment ordering a partition by licitation without benefit of an appraisal of three noncontiguous rural tracts.
We affirm.
FACTS
The land at issue consists of three tracts of land located several miles from Haugh-ton in Bossier Parish. Tract One contains 21 acres in the shape of a rectangle base with an “arm” running east-west from the base’s southwest corner. Tract Two is in the shape of a rectangle and measures approximately 18.5 acres. Tract Three is mostly in the shape of a rectangle. It measures approximately 78.5 acres.
As established at trial, co-owners shared undivided interests in the property in the following percentages:
• 25% Estelle Jones Gilbert and Harvey Aytch[1]
*738 • 25% Jones Estate Management
• 14.58% Scott Oliphant and Jerri Oliphant
• 8.38% Carey Jones
• 8.33% Len Jones
• 7.29% Robert Mitchell, III
• 4.17% Josephine Douglas-Peters
• 3.65% Kelsey Boyter
• 3.65% Robert Mitchell, IV
[ ^Robert Mitchell, III, Robert Mitchell, IV, Kelsey Boyter, Scott Oliphant, and Jerri Oliphant filed suit against the remaining co-owners seeking a partition by licitation. The plaintiffs asserted they were entitled to a partition by licitation on the ground that the defendants were absentees. However, as the lawsuit progressed, the defendants, or their representatives in some instances, filed answers. The plaintiffs established to the court and to the defendants prior to trial, as was shown in their pretrial memorandum,[2] that the partition by licitation was now being sought because of the characteristics of the property. The plaintiffs’ evidence at trial likewise concerned the property’s characteristics.
Following a trial on the merits, the court ordered partition by licitation without benefit of appraisal, and awarded the plaintiffs $750 in attorney fees against the Succession of Harvey Aytch. Douglas-Peters has appealed.
DISCUSSION
Douglas-Peters argues on appeal that the trial court erred in ordering the tracts partitioned by licitation.
Unless otherwise provided by law or juridical act, no one may be compelled to hold a thing in indivisión with another, and a co-owner has a right to demand partition of a thing held in indivisión. La. C.C. art. 807; Ark-La-Miss Timber Co. v. Wilkins, 36,485 (La.App.2d Cir.12/11/02), 833 So.2d 1154.
The court shall decree a partition in kind when the thing held in indivisión is susceptible to division into as many lots of nearly equal value as there are shares and the aggregate value of all lots is not significantly lower than the value of the property in the state of indivisión. La. C.C. art. 810.
When the thing held in indivisión is not susceptible to partition in kind, the court shall decree a partition by licitation or by private sale and the proceeds shall be distributed to the co-owners in proportion to their shares. La. C.C. art. 811.
The burden of proof is on the party seeking partition by licitation to prove that the property cannot be divided in kind. Tri-State Concrete Co. v. Stephens, 406 So.2d 205 (La.1981).
The general rule is that partition in kind is favored over partition by licitation. Tri-State Concrete, supra. Except as otherwise provided by law, or unless the property is indivisible by nature or cannot conveniently be divided, the court shall order the partition to be made in kind. La. C.C.P. art. 4606.
Property cannot be conveniently divided when the division would result in a *739 diminution of its value, or loss or inconvenience to one of the owners. Entrada Co. v. Unopened Succession, 38,800 (La.App.2d Cir.9/22/04), 882 So.2d 661.
| ,,The decision of whether land should be divided in kind or by licitation is a question of fact to be decided by the trial court. Green v. Small, 227 La. 401, 79 So.2d 497 (La.1955).
The trial court had the benefit of expert testimony from Normand Roy on behalf of the plaintiffs, and from John Lloyd and Forrest Rayburn on behalf of the defendants. Lloyd and Roy testified as expert real estate appraisers. Rayburn testified as an expert surveyor.
Roy relied on soil conservation maps when assessing the suitability of the land after it became impossible for him to gain access to the interior of any of the tracts because of the existing underbrush. He learned that the tracts had similar sandy loam surfaces, which he felt left them with poor potential for farming and fair potential for use as a pasture, making forestry the best use of the property.
Rayburn was asked by Douglas-Peters to divide each tract equally into four sections. He walked the perimeters of the tracts, and entered some of the tracts in order to get a better sense of what they looked like. Rayburn examined the sites to study any survey problems, road access, utilities, and general property descriptions that would affect partitioning the property. Lloyd performed a site inspection of the properties.
The court also heard testimony from Robert Mitchell, III, regarding the conditions and physical characteristics of the property. Mitchell was familiar with the three tracts because not only was he raised near them, but he also owns property adjacent to some of the tracts. In particular, he owns | ¿property on two sides of Tract Two, as well as on the south side of Tract Three.
Mitchell stated that water pooled on the east end of Tract Two, which he said had a low area of four to five acres that remains wet. He also stated that there were ditches in the north and eastern areas of Tract Three that held water, and that its southeast corner stayed wet.
Roy could not completely assess the flood potential of the property since he was unable to walk on the tracts as a result of the underbrush. Nonetheless, he did not think there were any special flooding considerations. 'While there may have been areas where water stood longer after a rainstorm, the property was not in a flood plain, and the soil handbook indicated that the tracts drained fairly well and the sandy soil would allow for some absorption.

Tract One

Although Douglas-Peters told Lloyd that she was hoping to partition each tract into four parts, his focus was to appraise the three tracts regardless of her proposed partition.
Tract One, which is approximately 21 acres, had no road access. Lloyd appraised the tract as being valued at $168,000, which he made subject to a road being connected to Potter Road because the tract is landlocked.
Roy believed that partitioning Tract One by dividing it would be virtually impossible because if the owner with the largest interest took part of the “arm” and part of the base, it would leave the remaining owners ^without access to the remainder of the tract. Roy stated that even if Tract One were developed for residential use, which he would not recommend, rights of egress and ingress would need to be obtained, and the arm would have to be used as a road. Roy appraised Tract One as being worth $58,000.
*740 When Rayburn examined Tract One, he realized there were some questions about where the section lines and property corners were located, so he offered a best-guess scenario until the property was actually surveyed. He needed to know the exact acreage in order to properly divide the property, which entailed obtaining a survey.
Rayburn suggested dividing Tract One into eight lots, with four small lots of equal size on the “arm” and four larger lots of equal size on the base. A road would be placed along the south boundary of the property, which would most impact the “arm” lots.

Tract Two

Potter Road goes in a north-south direction through Tract Two near its eastern edge. Roy appraised Tract Two as being worth $51,000. Lloyd appraised it for $148,000.
Rayburn suggested dividing Tract Two into four narrow lots of equal size with Potter Road running through the eastern side of each lot. An alternate offered by Rayburn was to have four smaller lots on one side of Potter Road and then four larger lots on the other side of Potter Road.

Tract Three

Hickory Nut Lane passes through the northwest corner of Tract Three, and Camp Zion Road goes through its northeastern corner. Oliver |7Road is parallel to the southern edge of Tract Three; however, Oliver Road is about 50 feet away from the southern boundary.
Roy testified that several people lived in the one acre of this tract that was separated from the remainder of the tract by Camp Zion Road. According to him, the upper right little triangle was so minuscule that he would suggest selling it to the adjoining landowners. Roy described the acreage as something of a junkyard with badly neglected improvements. Roy appraised Tract Three as being worth $200,500. Lloyd valued the tract at $435,000.
The differences in appraised values for the tracts can be largely explained by different approaches to comparables, or “comps,” taken by Lloyd and Roy. Lloyd utilized comps of more recent vintage to appraise the tracts, with no comp older than 3½ years, which was keeping in line with what he typically did for this type of property in this type of market. Roy considered it normal to use much older comps if they were similar and located nearby. He used comps as old as 9½ years to appraise Tract Three. Lloyd could not recall ever seeing an appraisal using comps that were dated 9 years. He explained that even in rural areas, lending institutions like to see a comp that is less than a year old. Lloyd allowed that the time frame for comps is within the discretion of the appraiser if the appraisal is not done for a bank or for a transaction backed by the government.
Rayburn suggested dividing Tract Three into two rectangular lots of equal size and two triangular lots of equal size. The rectangular lots would be in the western half of the tract, with one occupying the northwest quarter |sand the other the southwest quarter. The triangular lots would each have access to Camp Zion Road in one corner, and the northwest rectangle would have access to Hickory Nut Lane. In regard to the southwest lot, which lacked road access, Rayburn noted that there was a power line right-of-way alongside the southern edge of Tract Three. Rayburn asserted that this lot would have to gain access to a road either through an easement on the west line or through a right-of-way to Oliver Road. He noted there was nothing on the ground between Oliver Road and the 80-acre tract that would block such access.
*741 Rayburn also testified that if some roads were built on Tract Three from Camp Zion Road, then the tract could be divided into as many lots as were needed. He would not offer a figure when asked at trial if he could value one of the proposed lots in Tract Three.

Tracts in toto

According to Roy, the Soil Conservation Handbook indicated the tracts were not suitable for brick homes. However, Roy felt that if there were a single owner and a road could be put through half of a tract to create one-acre lots, then the soil could support manufactured homes with septic systems and water wells on each acre. Still, Roy did not believe the tracts were economically conducive to residential development.
Roy explained that separating the tracts into smaller lots would not be economically feasible based on the number of owners, and that the tracts would have to be collectively rebuilt after a partition in kind to make them economically viable. Roy believed that each tract needed a single owner in | norder to develop a model that banks would support. He recognized that considering the number of owners, a partition in kind would lead to roads having to be built on the tracts, especially on Tract Three.
In Roy’s opinion, because of the existing limited routes for ingress and egress, each tract would need to be owned by one person, even if the tract were used only for timber management. Roy concluded that partitioning the property in kind would result in breaking up the tracts into meaningless lots that would become too difficult to develop. He also could not envision how it would be possible to divide the land into lots of equal value. His opinion would not change even if he took into account that the defendants were uninterested in developing the property and wanted only to retain it.
When Lloyd was asked if he was aware of the ownership interests involved in the dispute, he replied that he only knew what he had learned from listening to prior testimony. He originally thought the family had been squabbling among themselves, and he believed he had been uninformed about the extent of the ownership interests.
Lloyd did not take the ownership interests into account when appraising the property, so he did not determine whether the division of the properties would affect the value of individual lots. He did not offer proposed divisions of his own, and he largely ignored the proposed divisions presented to him by defendants as they were not included in his function as an appraiser in this matter. Lloyd was questioned about whether dividing Tract Three into four equal lots would increase, decrease, or not |inchange the value of each lot. He answered that it would depend on the lots’ road frontage and ability to be accessed.
When Lloyd was reminded of Roy’s testimony that it would be almost impossible to divide the tracts in order to come up with lots of the same value by acre, Lloyd stated that he tended to agree that it would be difficult to do so, although he would not say it would be impossible.
Rayburn admitted that when he came up with his suggested partitions, he was not looking at value, but instead at size and acreage. He used four owners as the basis for his suggested partitions because he had been told there were four main people or four main families, and that the four groups could then divide it up later. While he felt that a partition based on the ownership percentages into lots of nearly equal value could be accomplished, he did not attempt such a partition because he did not want to proceed until an actual survey was performed. Rayburn agreed that it would not be a good time in terms *742 of the economy to divide the tracts into 100 lots, but he thought the tracts could be divided so that each owner could have his own piece of property. Rayburn did not believe there was anything about the nature of the property that would prevent it from being divided.
In its reasons for judgment, the trial court noted Roy’s testimony that as a result of the number of owners with varying interests and the lack of access to roads, dividing the property in kind was not feasible. Roy opined that a partition in kind would result in dividing the land into meaningless tracts and that it would be impossible to have tracts of equal value. The court recognized that while Lloyd’s appraisal differed substantially from _J_yRoy’s, Lloyd had conceded that a partition in kind would result in a diminution in value. It was also noted by the court that although Rayburn contended that a division in kind could be accomplished, he did not offer how it could be done without causing a diminution of value. In the end, the court gave great weight to Roy’s testimony, and to a lesser degree to Lloyd’s testimony, that a partition in kind would result in a diminution of value of the property.
After reviewing the testimony and evidence at trial, we cannot conclude that the trial court was clearly wrong in ordering a partition by licitation.

Appraisal

Douglas-Peters contends the trial court erred in not ordering the partition to be done with benefit of an appraisal.
Except as otherwise provided in La. C.C.P. art. 4606, the court has discretion to direct the manner and conditions of effecting the partition, so that it will be most advantageous and convenient to the parties. La. C.C.P. art. 4605.
This court has recognized that the unequal bidding power of the owners is a factor to be considered in determining the manner of partition. Tri-State Concrete Co. v. Stephens, 395 So.2d 894 (La.App. 2d Cir.1981). The plaintiffs own approximately 1,200 acres in the Haughton area. Mitchell, III, tried to buy Tract Two in its entirety at one point, but when not all of the co-owners would agree to the sale, he purchased an undivided |12interest in the tract so he could be aware of what was going on with the property.
The mere fact that the plaintiffs own substantial acreage in a rural setting is not enough to find unequal bidding power among the parties. The trial court did not abuse its discretion in ordering the partition to be done without benefit of an appraisal.
DECREE
At Douglas-Peters’ cost, the judgment is AFFIRMED.

. Melissa Flores, who testified as an expert in the field of title examinations, was unsure of *738 the division of ownership pertaining to Gilbert and Aytch. Gilbert conveyed an interest by joint-tenancy grant deed to Aytch in California. Flores was unfamiliar with joint-tenancies.

. The plaintiffs asserted in the memorandum that while they initially sought a partition by licitation that was premised on the defendants being absentees, they were now seeking such a partition because dividing the property through a partition in kind would be detrimental to the individual ownership interests due to the location and characteristics of the property.