Judgment rendered April 22, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,427-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

FAIRBANKS DEVELOPMENT, LLC            Plaintiff-Appellee

versus

CHARLES WOODROW JOHNSON            Defendant-Appellant
AND
JESSICA LYN PETERSEN            Defendant-Appellee

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2018-0576

Honorable Alvin R. Sharp, Judge

* * * * *

HALLACK LAW FIRM            Counsel for Appellant,
By:  Dennis W. Hallack            Charles Woodrow
     William H. Hallack            Johnson

KENNETH L. HARPER            Counsel for Appellee,
            Fairbanks Development,
            LLC

BARRY W. DOWD, A.P.L.C.            Counsel for Appellee,
By:  Barry W. Dowd            Jessica Lyn Petersen

* * * * *

Before WILLIAMS, GARRETT, and STEPHENS, JJ.

**GARRETT, J.**

One of the defendants, Charles Woodrow Johnson, appeals from a trial court judgment finding that he did not have any ownership interest in the immovable property involved in this matter and ordering that the property be partitioned by licitation instead of in kind. For the following reasons, we reverse in part and affirm in part the trial court judgment. The matter is remanded for further proceedings.

**FACTS**

Jessica Petersen and Johnson were in a relationship, but were not married when, in 2000, they moved to Calhoun, Louisiana, and used funds from Petersen's sizable trust account to purchase a large home, with a pond, on 18.8 acres of land. The house was purchased in December 2000, for $624,900. Although Petersen paid the entire purchase price in cash, both she and Johnson were shown in the appearance clause as the purchasers and both signed the deed and an attachment containing the property description as purchasers. In July 2001, Petersen used $150,000 from her mother to purchase approximately 15 additional acres that adjoined the original property. Petersen and Johnson were still not married, but both were again shown in the appearance clause as the purchasers and both signed the deed and an attachment containing the property description as purchasers. Both deeds reflect that the purchasers' mailing address was 205 Brown Road in Calhoun. Petersen was expecting their first child at that time.

Petersen and Johnson then married and had three children. During the marriage, Petersen used funds from her trust to enhance the property, including the building of two shop buildings, a long concrete driveway leading to the house, and an elaborate front gate. Johnson did not work

during the marriage and Petersen paid all the family's living expenses from her trust fund. In 2006, the couple divorced. Johnson remarried and had two more children. In 2017, Petersen moved to Florida. When Petersen left Louisiana, Johnson and his new family moved into the house.

In February 2018, Petersen sold all of her "right, title and interest, including but not limited to an undivided ½ interest" in the property to Fairbanks Development, LLC ("Fairbanks"), for $250,000. The deed was recorded on February 14, 2018. She also granted to Fairbanks an option to purchase for $100,000 "any interest she may have in her ex-husband's presumptive one-half interest" if she was found to be the sole owner.[1]

On February 15, 2018, Fairbanks filed the present suit for partition by licitation against Johnson and Petersen. Fairbanks asserted that it owned an undivided one-half interest in the property and Johnson and Petersen owned the other undivided one-half. Fairbanks argued that the property could not be partitioned in kind, and a partition by licitation was required. The

---

[1] The option was signed on behalf of Fairbanks by Kenneth L. Harper, the attorney who represented the company in this litigation. The option provided:

> . . . .FAIRBANKS DEVELOPMENT, LLC has agreed to finance litigation against Charles Woodrow Johnson in order to recover that interest. In exchange for that, Jessica Petersen has agreed to grant Fairbanks an option to purchase that share of the property at a price that is less than the current market value.

> 3. The option or right granted and created hereby is in the nature of a continuing offer to sell the property made by SELLER to PURCHASER, which offer shall remain open to PURCHASER for a period ending 90 days from final judgment in the case against SELLERS [sic] ex-husband.

> 4. The consideration for the granting of this option or continuing offer to sell by SELLER to PURCHASER is the PURCHASER advancing the court cost and attorney fees of an attorney of PURCHASERS [sic] choosing, to pursue a case against SELLERs [sic] ex-husband Charles Woodrow Johnson to attempt recovery of the presumptive one-half interest of Charles Woodrow Johnson for Jessica Petersen.

2

company sought a public sale of the property. Fairbanks noted that Johnson lived in the house, and sought to recover rent from him, along with reimbursement for taxes, insurance, necessary expenses for upkeep, and attorney fees.

Petersen answered, claiming that Johnson had no ownership claim to the property. She alleged that she was the sole owner of all of the property because she bought it with her separate funds before she and Johnson were married. She filed a cross-claim against Johnson to be declared the sole owner of the property, or, in the alternative, to be reimbursed for her separate funds used to purchase and enhance the property. She also sought to recover rent from Johnson, who was living in the house. Johnson contended that he was the owner of an undivided one-half interest in the property and denied all claims made against him by both Fairbanks and Petersen.

The matter was tried on April 15-16, 2019. On July 17, 2019, the trial court issued written reasons for judgment. Essentially, the trial court found that Petersen was the sole owner of the property. According to the trial court, the property was purchased before the marriage with Petersen's separate funds and Johnson did not contribute anything to the purchase price. The court stated that Petersen properly sold a one-half interest in the property to Fairbanks and that Petersen owned the other half. The court found that, based upon the testimony of the expert appraisers, the property in question must be partitioned by licitation and not in kind. A judgment to that effect was signed by the trial court on July 25, 2019.

Johnson appealed, claiming that the trial court erred in failing to recognize that, because both parties were listed as purchasers on the deeds,

3

the presumption of equal co-ownership applied here. He maintains that the presumption was not rebutted. He also asserts that the trial court erred in finding that the property must be partitioned by licitation and not in kind.

## OWNERSHIP ISSUES

According to Johnson, both parties signed the deeds as purchasers and, under La. C.C. art. 797, it is presumed that they are equal co-owners in indivision. He also argues that the presumption of equal co-ownership was not rebutted at the trial on the merits. These arguments have merit.

### Legal Principles

Because the parties were not married at the time the property at issue here was purchased, the division of the property is governed by the Louisiana Civil Code provisions governing ownership in indivision. *See Sampognaro v. Sampognaro*, 41,664 (La. App. 2 Cir. 2/14/07), 952 So. 2d 775, *decision clarified on reh'g*, 41,664 (La App. 2 Cir. 4/11/07), *writ denied*, 2007-937 (La. 6/22/07), 959 So. 2d 500; *Olson v. Olson (Olson II)*, 50,629 (La. App. 2 Cir. 5/18/16), 196 So. 3d 19. Ownership of the same thing by two or more persons is ownership in indivision. In the absence of other provisions of law or juridical act, the shares of all co-owners are presumed to be equal. *See* La. C.C. art. 797.

An authentic act constitutes full proof of the agreement it contains, as against the parties, their heirs, and successors by universal or particular title. La. C.C. art. 1835. An authentic act is clothed with a presumption of genuineness. *Bank of New York Mellon v. Smith*, 2015-0530 (La. 10/14/15), 180 So. 3d 1238. When such an act is silent as to the proportions of the respective interests of the co-vendees listed, prior cases have allowed the introduction of parol evidence for the limited purpose of determining those

4

respective interests. *In re Succession of O'Krepki*, 16-50 (La. App. 5 Cir. 5/26/16), 193 So. 3d 574, *writ denied*, 2016-1202 (La. 10/10/16), 207 So. 3d 406; *Succession of LeBlanc*, 577 So. 2d 105 (La. App. 4 Cir. 1991). Other evidence that the parties did not intend to be co-owners or that they did not intend for their shares to be equal could include a counter letter or declaration, placed in the conveyance records, stating the intent of the co-owners. *See Deklerk v. Deklerk*, 2014-0104 (La. App. 4 Cir. 7/29/15), 174 So. 3d 205.

The presumption of equal ownership is rebuttable to the extent that the court will decree ownership in proportion to the amount and consideration contributed by each of the vendees. *In re Succession of O'Krepki*, *supra*; *Succession of LeBlanc*, *supra*. There is reasoning in the jurisprudence that the "consideration" used in *Succession of LeBlanc*, *supra*, actually means "cause" under La. C.C. art. 1967, where the term is defined as the reason why a party obligates himself. *See Slimp v. Sartisky*, 2011-1677 (La. App. 4 Cir. 9/17/12), 100 So. 3d 901, *amended on reh'g in part*, 2011-1677 (La. App. 4 Cir. 10/11/12), *writ denied*, 2012-2430 (La. 1/11/13), 107 So. 3d 616; *Aaron & Turner, L.L.C. v. Perret*, 2007-1701 (La. App. 1 Cir. 5/4/09), 22 So. 3d 910, *writ denied*, 2009-1148 (La. 10/16/09), 19 So. 3d 476.

Contracts have the effect of law for the parties. La. C.C. art. 1983. In interpreting contracts, we are guided by the general rules contained in La. C.C. arts. 2045-2057. Subject to the limits imposed by law, parties are free to contract as they choose. *Slimp v. Sartisky*, *supra*. The cardinal rule, as set forth in La. C.C. art. 2045, is that interpretation of a contract is the determination of the common intent of the parties. When they are clear and

explicit, no further interpretation may be made in search of the parties' intent. *See* La. C.C. art. 2046.

A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong, and, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989); *Slimp v. Sartisky*, *supra*.

**Discussion**

The resolution of the ownership issues raised on appeal by Johnson requires a review of the evidence adduced at trial concerning the intent of the parties when they signed the deeds for the purchase of the property at issue here. Instead of considering and analyzing the parties' intentions at the time of the acquisitions, the trial court improperly focused on the subsequent failure of the parties' relationship and marriage, which occurred years later.

Johnson testified that he and Petersen previously lived in Georgia before they were married and that they purchased a house there also, using Petersen's funds and signing the deed as purchasers. That house was sold after they moved to Louisiana. Johnson stated that he had worked in Georgia as a mechanic, and later he worked at a grocery store. However, because Petersen liked to take long trips, she requested that he quit his job. He did so and did not work during their marriage. The couple lived off Petersen's money and, until late in the marriage, Petersen was not particularly insistent that he get a job.

6

Johnson acknowledged that the property at issue here was all purchased prior to his marriage to Petersen and that he did not furnish any funds for the purchase of either tract. According to Johnson, when he put his name on the deeds, it was his intention to be an owner. The court asked Johnson if he was expecting to get partial ownership of the property for free. Johnson responded, "I mean I guess so." He said he thought he and Petersen were building a life together and that they were sharing, even though he did not contribute to the purchase price. He said he assumed it was "our" property. He said that was the way Petersen "wanted it." Johnson stated that Petersen wanted "something bigger and fancy and that's kind of the way we went with it." Johnson said that he and Petersen went together to view several properties when they were shopping for their home. The court asked if Petersen essentially said, "[L]ook here, baby, don't you worry about it[.] I got it. This is how we are going to do things." Johnson said. "Yes." Johnson said that they shared almost everything at that time, even though they were not yet married.

The court questioned whether Johnson ever offered to provide any money for the purchases. He said that he did not. The court asked if Petersen ever said, "I need you to hurry up and get some cheese and pay me back on that property." Johnson said she did not. He and Petersen went to the closing together and Petersen never asked him for any money.

Johnson said that their first child was born shortly after they moved into the house on the property. When asked what he did instead of working, Johnson said that they worked on the house and got organized. Because they were trying to sell the house in Georgia, he frequently went there to look after that property. Johnson also said that he worked on the property at

7

issue here. According to Johnson, Petersen only began to suggest that he get a job around the time they divorced, which was approximately six years after the property was purchased.

Petersen testified that she originally purchased the house and land, which had a pond, using her trust fund money and then purchased an adjacent tract using money from her mother, which she later repaid. She was not married to Johnson at the time of the purchases. She filed settlement statements into evidence, establishing the amount of the funds she took out of her trust fund for the purchase of the property, improvements, and living expenses during the marriage. This amount was approximately $1.5 million. She also filed into evidence the check for $150,000 from her mother that was payable to Petersen alone. She stated that Johnson never paid for any of the property or the improvements and that she paid the property taxes. In the divorce, she was granted the use of the house and she lived there for a period of time. She eventually moved to Florida and Johnson moved into the house. He had not paid any rent during the time he lived there.

In response to questioning about the intent when the deeds were signed, Petersen said that the couple's intent was to have a home in which to raise their children. She said that she was led to believe that Johnson was going to "contribute and supply and be a part of the family." Petersen testified that the couple had agreed to start a life together and Johnson told her he was going to work after they were married and got settled in a new home. However, he did not fulfill his agreement.

Petersen said that she had been trying to sell the property for 13 years since the divorce. According to her, they had one offer to buy all the

property for $500,000, but Johnson would not agree to the sale. She later sold her presumptive undivided one-half interest to Fairbanks for $250,000, with an option for the company to buy the other one-half for $100,000, if she was found to be the owner. She paid the taxes on the property and, in 2017, got a mortgage on the property to pay the tax bill of $6,000.

The trial court questioned Petersen about her intent when the couple signed the deeds for the two pieces of property. She said, "So, when we're at the point of signing the papers and I'm being directed and led by him to believe that things are going to be one way we get the papers signed and after that it's not like that." The trial court then asked Petersen:

> [W]hy in the world would a sister that's got this kind of cheese why would she give it up to a brother that ain't working? That ain't got a job. I mean, you know, ain't bringing nothing to the table. What's that about?"

Petersen responded:

> I ask myself that question every single day. The only thing I can tell you is young and dumb and made mistakes. That was my first love. We met when I was fifteen years old, and he knows what he did.

The court asked Petersen whether it was her intent to be the owner of the property and whether Petersen's mind "was on the same page" as Johnson's. Petersen said it was not. She was then asked by the court, "What was your mind?" Petersen said that they were going in as "partners" and Johnson led her to believe that he was going to fulfill his portion of the partnership. She said that Johnson "never contributed anything back to the relationship, to the marriage, emotionally, financially, anything."

Johnson testified again that it was his intent to be a co-owner of the property, even though he did not contribute to the purchase price and had not paid any of the property taxes.

9

Because Petersen and Johnson signed the deeds as co-owners, a rebuttable presumption arose that they were equal co-owners in indivision. The relevant inquiry on the issue of ownership is whether Petersen and Johnson intended to be co-owners of the two pieces of property when the deeds were signed. Both parties clearly stated that their intent at that time in buying the property was to start a life together, to have a family, and to have a family home. Petersen herself stated that, when the parties signed the deeds, they intended to be partners. If, at the time the purchases were made, Petersen intended to be the sole owner of the property, she could have made the purchases solely in her name. If the parties intended different percentages of co-ownership, they could have specified a percentage of ownership interest in the deeds, or they could have executed a counter letter or declaration and placed it in the conveyance records, stating their intent other than to be equal co-owners. None of these measures was taken. Matters that arose later in the dissolution of the marriage had no effect on the intent of the parties at the time the deeds were signed.

This testimony shows that the intent, at the time the deeds were signed, was to be equal co-owners of the property which was purchased to provide a home for Petersen and Johnson's growing family. When the marriage failed, Petersen could not then change her mind as to that intent in contravention of the clear wording of the deeds listing the parties as co-owners and the stated intent of the parties to be partners at the time the deeds were signed.

Other facts in this case not considered by the trial court also indicate that the parties considered themselves to be co-owners of the property. In the course of their divorce proceedings, Petersen was granted the right to use

10

the house, indicating that the parties contemplated that Johnson had an ownership interest in the property. After the divorce, when the parties received an offer to purchase the property for $500,000, Petersen sought Johnson's consent, indicating that she thought he had an ownership interest in the property.

At the hearing in this matter, Petersen argued that Johnson was not an equal co-owner because he did not make any monetary contributions to the purchases. She essentially contended that Johnson's failure to contribute any funding to the purchase, improvement, or upkeep of the property rebutted the presumption that they were equal co-owners in indivision. However, nonmonetary contributions are considered in determining the division of ownership. *See Deklerk v. Deklerk*, *supra*.

Although Petersen contends that Johnson made no contribution to the relationship or marriage, the record shows that he did make nonmonetary contributions. He helped with the upkeep and sale of the couple's previous home in Georgia and he worked on the property at issue here after its purchase. He also gave up his job in order to travel with Petersen at her beck and call. Petersen did not dispute that Johnson gave up his job in order to travel with her. Johnson's situation was no different from many women who did not work outside the home, but contributed in other ways, while men who possessed the means financed the communal life.[2] As will be discussed below, in such situations, both parties are frequently found to be equal co-owners in indivision of the family home.

---

[2] Each spouse contributes to the expenses of the marriage as provided in the matrimonial agreement. In the absence of such a provision, each spouse contributes in proportion to his means. La. C.C. art. 2373.

In deciding that Petersen was the sole owner of the property, the trial court did not examine or apply the law to the facts presented, but rather exhibited an emotional response to the fact that Johnson made no monetary contributions to the purchase of the property. The result reached by the trial court is contrary to the jurisprudence.

The following cases illustrate the trial court's error in finding Petersen to be the sole owner of the property here. In *Olson v. Olson (Olson I)*, 48,968 (La. App. 2 Cir. 4/23/14), 139 So. 3d 539, *writ granted*, 2014-1063 (La. 10/3/14), 149 So. 3d 275, and *writ denied as improvidently granted*, 2014-1063 (La. 1/28/15), 159 So. 3d 448, a married couple with a separate property agreement used the wife's separate funds to purchase two condominium units, with no contribution from the husband. This court reversed a trial court judgment which allocated to the wife the sole ownership of the two units. We held that each party owned, as separate property, a one-half interest in each of the two condominium units.

In *Tassin v. Tassin*, 2014-488 (La. App. 3 Cir. 12/3/14), 161 So. 3d 818, a married couple with a separate property regime purchased a house in both their names. The couple were eventually divorced. The court found that each party owned a one-half interest in the house.

In *Slimp v. Sartisky*, *supra*, an unmarried couple purchased a house together. The man put in more money than the woman. The court found that the couple, even though unmarried, purchased the home to live together as a family unit. When the relationship failed, and the house was partitioned, the court found that each party was a one-half owner of the house.

In *Deklerk v. Deklerk*, *supra*, a husband and wife, with a separate property regime, purchased a home, had a family, and lived solely on the husband's earnings during their 29-year marriage. The wife did not work, but made nonmonetary contributions to the family life. The court found, that, at the time of the purchase, the parties intended to be equal co-owners of the house.

In *Succession of LeBlanc*, *supra*, a couple purchased a house together before they were married. The couple married later. In the man's succession, the court found that the parties each acquired a one-half interest in the house.

In *Morrison v. Richards*, 343 So. 2d 375 (La. App. 4 Cir. 1977), a husband and wife, with a separate property regime, purchased a house. Both parties were listed on the deed as buyers. After the wife died, the husband claimed he purchased the house with his separate funds and the wife had no ownership interest in the property. Therefore, he claimed that her two sons from a prior marriage were not entitled to her interest in the house. The court found that, under the clear wording of the deed, listing both parties as purchasers, the deceased wife was a one-half owner of the house, and her interest passed to her sons.

In *In re Succession of O'Krepki*, *supra*, a married couple with a separate property regime purchased a house and both were listed as owners on the deed. After the husband's death, his son from a prior marriage sought a declaratory judgment that the house was entirely owned by his father. The wife filed a motion for summary judgment claiming, among other things, that she was owner of a one-half interest in the house. The trial court granted the motion for summary judgment. On appeal, the fifth circuit

13

reversed the grant of summary judgment. The court noted the rebuttable presumption that co-owners own an equal share of the property owned in indivision and found that there were genuine issues of material fact as to whether the wife made nonmonetary contributions consistent with her respective contribution to the marriage and whether the parties mutually intended at the time of the purchase that the wife was an equal co-owner of the property. The matter was remanded for further proceedings.

Based upon this record, we find that the trial court erred in finding that Petersen was the sole owner of the property. The record shows that the parties were equal co-owners of the property in indivision. That portion of the trial court judgment finding that Petersen was the sole owner and that Johnson did not own an undivided one-half interest is reversed.

## PARTITION IN KIND OR BY LICITATION

Johnson argues that the trial court erred in finding that the property was not subject to partition in kind and that the property must be partitioned by licitation. This argument is without merit.

### Legal Principles

As stated above, ownership of the same thing by two or more persons is ownership in indivision. *See* La. C.C. art. 797. No one may be compelled to hold a thing in indivision with another. Any co-owner has a right to demand partition of a thing held in indivision. La. C.C. art. 807. The court shall decree partition in kind when the thing held in indivision is susceptible to division into as many lots of nearly equal value as there are shares and the aggregate value of all lots is not significantly lower than the value of the property in indivision. La. C.C. art. 810.

14

When the thing held in indivision is not susceptible to partition in kind, the court shall decree a partition by licitation or by private sale and the proceeds shall be distributed to the co-owners in proportion to their shares. La. C.C. art. 811.[3]  Property cannot be conveniently divided when a diminution of its value, or loss or inconvenience to one of its owners, would be the consequence of such division.  *Olson I*, *supra*; *Mitchell v. Cooper*, 48,125 (La. App. 2 Cir. 7/24/13), 121 So. 3d 736.

Division in kind is inconvenient when landowners would acquire remote areas inaccessible except by crossing another's property.  Such a situation results in economic loss, inconvenience, and legal difficulties.  *See Ark-La-Miss Timber Co., Inc. v. Wilkins*, 36,485 (La. App. 2 Cir. 12/11/02), 833 So. 2d 1154.

Whether and how property is partitioned is fact-specific, considering such factors as the natural characteristics of the land, size of a tract, presence or absence of public road access, number of owners in indivision, and existence of any contamination.  The burden of proof is on the party seeking partition by licitation to prove that the property cannot be partitioned in kind. *See Cahill v. Kerins*, 34,522 (La. App. 2 Cir. 4/4/01), 784 So. 2d 685; *Lazarus Trading Co., LLC v. Unopened Succession of Washington*, 50,810 (La. App. 2 Cir. 8/17/16), 201 So. 3d 989; *Mitchell v. Cooper*, *supra*.  The decision of whether land should be divided in kind or by licitation is a

---

[3] La. C.C.P. art. 4606 states that, except as otherwise provided by law, or unless the property is indivisible by nature or cannot conveniently be divided, the court shall order the partition to be made in kind.  When a partition is to be made by licitation, the sale shall be conducted at public auction and after the advertisements required for judicial sales under execution.  All counsel of record, including curators appointed to represent absentee defendants, and persons appearing in proper person shall be given notice of the sale date.  At any time prior to the sale, the parties may agree upon a nonjudicial partition.  La. C.C.P. art. 4607.

15

question of fact to be decided by the trial court. *Mitchell v. Cooper*, *supra*; *Entrada Co. v. Unopened Succession*, 38,800 (La. App. 2 Cir. 9/22/04), 882 So. 2d 661; *Marsh Cattle Farms v. Vining*, 30,156 (La. App. 2 Cir. 1/23/98), 707 So. 2d 111, *writ denied*, 98-0478 (La. 4/24/98), 717 So. 2d 1167. A trial court's factual findings will not be upset unless they are manifestly erroneous or clearly wrong. *Lazarus Trading Co., LLC v. Unopened Succession of Washington*, *supra*.

Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Under the manifest error standard, the linchpin is whether the trial court's findings are reasonable; in other words, if there is a reasonable factual basis for the trial court's finding, even if the appellate court feels its own evaluation of the evidence is more reasonable, the trial court's findings cannot be reversed. *Cahill v. Kerins*, *supra*.

**Discussion**

The trial court did not err in finding that this property required partition by licitation and not in kind. The record shows that Fairbanks carried its burden of proving that a division in kind would result in a diminution of its value, or loss or inconvenience to one of its owners.

Kensill Brewer, an expert in residential real estate appraisals, testified regarding the value of the property and the feasibility of a partition in kind. He stated that the house, located in a rural area, is 21 years old and is 4,395 square feet. He was not asked to appraise all the land and the house together. According to Brewer, smaller tracts of land are worth more per acre.

16

He was originally asked to appraise the house and two acres of land separately, and the remaining land as a separate tract. Separating the property to place the house on a two-acre tract of land would cut off access from the public road and would eliminate the use of the concrete driveway. The owner of the house would be required to secure a right of ingress and egress from the owner of the remainder of the property. This would also limit or eliminate access to the pond located close to the house. Brewer testified that the property would be devalued by the lack of frontage on the public road and the water. This would create a real marketability problem for the house.

He then came up with a way to place the house on 4.75 acres of land, giving the house frontage on the road and water.[4] Brewer did not confirm on the ground that his proposed division would include the driveway. There was some confusion as to whether he was looking at the driveway or the power line right of way. His written appraisal of the house and 5.75 acres of land valued the property at $315,000.

The remainder of the land, totaling approximately 28 acres, was appraised at $238,425. The 28-acre tract contained rolling hills with mixed pine and hardwood stands of varying ages of maturity. It also contained the remainder of the pond close to the house, a second pond, a metal fence with brick columns, and a shop suitable for working on cars.

---

[4] The record is inconsistent as to whether this tract was 5.75 acres or 4.75 acres. The written appraisal, prepared by Brewer and submitted into evidence, specifies that the house was appraised with 5.75 acres of land. There is one map of the proposed division specifying that the house was placed on 5.75 acres. Another notation states the land included with the house was 4.75 acres. Brewer's testimony at one point mentions 5.75 acres and at other times he uses 4.75 acres.

Brewer was asked whether the property could be divided into two tracts of equal value. He was not sure that could be done. He said that dividing the property in two tracts of equal value would substantially reduce the value of the property as a whole. According to Brewer, "it would have to be twisted up so much" that the value and marketability of both tracts would be substantially reduced. He essentially stated that he did not think the property could be configured in such a way as to make two useable tracts of equal value. The difference in the appraisals of the two tracts was $77,000. Brewer noted the disparity in the value of the two pieces of property and said that he did not know how to reduce the difference, stating, "I don't know how you get those numbers that close together by moving land around."

Robert McBroom, an expert in residential real estate appraisal, also testified that he was not asked to appraise the property as a whole. McBroom agreed with Brewer that the property appraised as a whole would be worth less. He stated that, the way he measured the house, it only had 4,053 square feet. He noted that the driveway was 585 long and 12 feet wide. He appraised the house and two acres of land at $310,000, and the other tract, containing 30.86 acres, at $295,000. McBroom said that he did not include any value for the shop located on the 30.86-acre tract.

Rockland Burks, the manager of Fairbanks, testified that his company deals in real estate and timber. Burks stated that he thought McBroom's division of the property containing the house did not include the driveway. He thought that the driveway was several hundred feet north of the line used by McBroom. He thought that McBroom had used the power line right of way, located on the southern boundary of the property, for the driveway.

18

Johnson testified that the property had a 12-foot wide concrete driveway, a shop, and an entrance that were all built after the property was purchased. These improvements cost approximately $300,000. According to Johnson, the driveway was not on the southern boundary of the property, as indicated in one of the appraisals. The southern boundary was the power line right of way. He also said that not all of the driveway was included on the 4.75-acre tract drawn by Mr. Brewer. Johnson stated that he thought the driveway could be relocated to follow the power lines in order to facilitate division of the property. However, he did not know what would have to be done regarding the power line rights of way and easements.

The record fails to show that the property can be divided into two pieces of equal value without resulting in a diminution of value or a loss or inconvenience to one of the owners. Brewer's testimony demonstrated that, even if the property could be divided to place the house on four or five acres, there would still be questions about whether the driveway to the house and useable access to the pond close to the house would be included. McBroom's division of the property, placing the house on two acres, also exhibited significant difficulties in access to the driveway, the main road, and the pond. Brewer's appraisals of the two pieces of land differed by $77,000. McBroom's appraisals differed by $15,000. Even though Johnson stated that he thought the driveway could be relocated along the right of way for the power lines, his testimony was speculative. He admitted that he did not know if there might be problems with locating the driveway on a power line easement.

The record simply fails to how that this property can be divided into two useable pieces of equal value. Under the facts presented here, the trial

19

court did not err in ordering a partition by licitation. That portion of the trial court judgment is affirmed.[5]

## CONCLUSION

For the reasons stated above, we reverse that portion of the trial court judgment finding that Petersen was the sole owner of the property at issue in this matter. Petersen and Johnson were equal co-owners in indivision. Therefore, we find that Johnson is owner of an undivided one-half interest in the property.

We affirm that portion of the trial court judgment finding that the property is not subject to partition in kind and ordering that it be partitioned by licitation. We remand the matter to the trial court for a partition by licitation between Fairbanks and Johnson. Costs in this court are assessed one-half to Petersen, and one-half to Johnson.

**REVERSED IN PART; AFFIRMED IN PART; REMANDED FOR FURTHER PROCEEDINGS.**

---

[5] In her cross-claim against Johnson, Petersen sought reimbursement for her separate funds used to purchase and enhance the property if she was found not to be the sole owner. She also sought to recover rent from Johnson, who was living in the house. Very little evidence is contained in the record regarding these claims. Because the trial court found that Petersen was the sole owner of the property, it did not consider her reimbursement claims. We note that, if the property was being partitioned between Petersen and Johnson, she might possibly have some claims for reimbursement. See, for example, La. C.C. arts. 798-806 and La. C.C. art. 2803. However, because Petersen transferred her interest in the property to Fairbanks, it is unclear whether any rights she had to reimbursement remained hers, passed to Fairbanks, or were extinguished. In the petition for partition by licitation, Fairbanks sought to recover rent from Johnson, along with reimbursement for taxes, insurance, necessary expenses for upkeep, and attorney fees. No evidence was adduced on these claims. The trial court did not address any claims for reimbursement raised by Fairbanks. These matters were not raised on appeal and are issues for another day.

20